Ronald S. HAFT, Plaintiff,

v.

Herbert H. HAFT, Defendant,

v.

DART GROUP CORPORATION,
Nominal Defendant.

Civil A. No. 14425.

Court of Chancery of Delaware,
New Castle County.

Submitted: Sept. 18, 1995.
Decided: Nov. 14, 1995.

Stuart M. Grant, and Jay W. Eisenhofer, of Blank, Rome, Comisky & McCauley, Wilmington, for Plaintiff.

Elizabeth M. McGeever, Ronald A. Brown and Thomas A. Mullen, of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, of counsel: Scott W. Muller, and Michael F.

Orman, of Davis Polk & Wardwell, Washington, DC, for Defendant.

Arthur G. Connolly, Jr., of Connolly, Bove, Lodge & Hutz, Wilmington, of counsel: Stephen J. Brogan, of Jones, Day, Reavis & Pogue, Washington, DC, for Nominal Defendant.

## OPINION

ALLEN, Chancellor.

The questions presented are whether a proxy to vote shares of stock was validly made irrevocable when granted and, if so, whether it continues to be irrevocable.

The case arises from a July 28, 1993 transaction in which Herbert H. Haft transferred a block of the Class B common stock of Dart Group Corporation ("Dart") to his younger son Ronald S. Haft in exchange for cash, a note, and the grant of a "lifetime" irrevocable proxy to vote the stock transferred. The stock in question is a block of 172,730 shares of Class B common stock of Dart, the sole class of voting stock of the corporation. The Class B shares that were transferred constituted 57% of the then outstanding Class B shares and thus carried with them the power to elect the board of directors of Dart.

The July 1993 transaction arose in the context of a complex and apparently acrimonious family dispute that included the dissolution of the long-term marriage between Herbert and Gloria Haft. The three children of the marriage were pulled to one side of that dispute or the other. Elder son Robert and daughter Linda sympathized with their mother. Their brother Ronald may have been inclined differently. In any event, the July 1993 transaction might be interpreted as an alliance between Herbert and Ronald. At the time of Herbert's transfer of legal title to the Dart Class B stock to him, Ronald also signed an employment contract with Dart to become President and Chief Operating Officer of the company, a position that had formerly been held by Robert. In connection with acceptance of that office Ronald acquired from the Company, options to buy additional shares of Class B stock, or so it is alleged.

If it was a long term alliance that was envisioned in July 1993 by Herbert and Ronald, events were to disappoint those expectations. On September 12, 1994, Ronald instituted suit against Dart seeking the specific performance of his alleged option to purchase additional Class B stock. That suit (the "option litigation") was one of a complex welter of suits instituted among members of the Haft family in this court, in the United States District Court for the District of Delaware, and in the courts of the District of Columbia, relating to control of Dart or to claims against it. On July 18, 1995, Ronald instituted this litigation against his father. This suit (the "proxy litigation") purports to allege claims for breach of contract, for breach of fiduciary duty to Ronald as the grantor of a proxy, and, derivatively, for breach of fiduciary duty to Dart itself. Importantly, the suit seeks a declaration that the proxy given to Herbert was validly revoked on June 30, 1995, or, in the alternative, that the proxy will be revocable once the promissory note given in consideration of the transfer of the Class B common stock is satisfied.

Herbert Haft has counterclaimed for breach of contract and seeks rescission of the transfer of the Class B stock on several theories, including an alleged breach of contract, failure of consideration, attempted partial rescission by Ronald, mutual mistake, and unilateral mistake.

Now pending are cross-motions for summary judgment. Ronald Haft has moved for partial summary judgment on two counts of his complaint: that the proxy given to his father was validly revoked or, in the alternative, that the proxy will be revocable once the promissory note is satisfied. Herbert Haft, in turn, has moved for summary judgment on these counts as well and for summary judgment dismissing plaintiff's claims for breach of contract and breach of fiduciary duties. Finally, Herbert has moved for summary judgment on his counterclaim seeking rescission of the transfer.

■ A motion for summary judgment will be granted when (1) the record establishes that, viewing the facts in the light most favorable to the nonmoving party, there is no

genuine issue of material fact, and (2) in light of the relevant law and those facts, the moving party is legally entitled to judgment. *Burkhart v. Davies,* Del.Supr., 602 A.2d 56, 58–59 (1991). This opinion addresses only a portion of the various issues presented by these cross motions. In this opinion I address and reject Ronald Haft's motion for summary judgment with respect to his claim that he effectively revoked the proxy that was part of the July 1993 transaction and I reject, as well, plaintiff's claim that the proxy will (has) become revocable once the note that he gave to Herbert Haft in July 1993 is satisfied.[1]

## I. General Background

Herbert H. Haft is the founder of Dart and has been Dart's Chief Executive Officer and Chairman of the Board since 1960. In still other related litigation ("The Class A shareholders derivative suit") it is claimed that Herbert Haft has dominated and mismanaged Dart, enriching himself at the cost of the corporation. These claims are not pertinent to the pending motions, but are noted simply as further context. Dart's capital structure comprises two classes of stock: Class B common stock which has voting rights and has always been held only by members of the Haft family, principally Herbert, and Class A common stock which has no voting rights and is publicly traded. Prior to the July '93 transfer to Ronald, the B stock was owned by Herbert (172,730 shares or 57%); Gloria (18%); Robert (8.33%); Linda (8.33%) and Ronald (8.33%). Herbert also owns 122,747 shares of the Class A Dart common stock.

As mentioned, as part of the July transfer Ronald Haft acquired an option to purchase certain authorized but unissued shares of Dart Class B stock. That option covered up to 197,048 shares at a price equal to 110% of the then current market price of the nonvoting Class A common stock.

The terms of the July 1993 stock transfer were as follows: Herbert transferred to Ronald all 172,730 shares of Class B stock that he owned in exchange for stated consideration of $13,818,400, consisting of $2.8 million in cash and a twenty year promissory note (due on August 1, 2013) for the balance. This sale was made pursuant to a Contract for the Transfer of Securities (the "Transfer Contract"), in conjunction with which Ronald executed and delivered the promissory note (the "Note"). At the same time, Ronald granted a "lifetime" irrevocable proxy back to his father. Notably, of course, the irrevocable proxy that accompanied the transfer would make it more likely that Herbert would be able to continue to elect the board of Dart, despite any division of the proceeds of the sale that a marital court might order as part of a division of marital property.

Some ten months later, on May 17, 1994, all five members of the Haft family signed two settlement agreements that attempted to settle all disputes among the family members, including a divorce settlement. After this settlement, business relations between Ronald and Herbert appear to have deteriorated. On September 6, 1994, Ronald Haft attempted to exercise the option purportedly granted in his employment contract to purchase 197,048 shares of Dart Class B stock. The Company's board of directors, however, refused to recognize that right at that time.[2]

1. After these motions were taken under consideration, the parties informed the court that a complex (revocable in part) transaction between Dart and Ronald has subsequently been agreed to and closed, which purported, *inter alia,* to advance the necessary funds to Ronald to pay off his father's note according to its terms, and take other steps including the purported settlement of disputes between Dart and Ronald Haft. While the evidentiary record contains nothing about these later developments, I recognize that whether Herbert's proxy was supported by an additional cognizable interest sufficient to render it irrevocable despite the prepayment of the note, is a question that may have a bearing on the effec-

tiveness at law or in equity of the actions purportedly taken by those Dart directors who authorized the transaction with Ronald. Given these later developments and their possible importance, I find it prudent to reach this legal question despite the fact that Herbert Haft's security interest in the proxy shares was (is) sufficient, in and of itself, to make the proxy irrevocable as of the time of submission of this motion to the court.

2. Ronald Haft eventually brought the option litigation in this court seeking to enforce his claims. The option litigation has, subsequent to the submission to the court of the pending cross motions

On September 7, 1994, an Executive Committee, comprised of four non-Haft directors, was formed to act in areas of disagreement between Ronald and Herbert Haft, and by October 11, 1994, the role of this Executive Committee is claimed to have been expanded to include all affairs of Dart, effectively removing Herbert (the fifth director) from board deliberations. Sometime shortly after this, Herbert, who continued as Dart CEO, advised the Executive Committee that Ronald should be terminated from his positions with Dart. The board did not do so; a standstill order entered by this court in the option litigation precluded such action at that time without prior notice and hearing, a procedure that was not employed.

On June 30, 1995, Ronald Haft sent his father a letter purporting to revoke the proxy Herbert held. Without indicating the grounds for revocation, the letter simply stated that it "hereby revokes the Proxy . . . [t]hat the Proxy is no longer in effect and [that Ronald] shall retain the vote" of the Class B common stock. In response Herbert Haft purported to rescind the transfer of the Dart Class B stock asserting that the purported revocation by Ronald was a material breach of the stock sale contract. This suit was then instituted by Ronald in order to secure a declaratory adjudication of the validity of Ronald's revocation of the proxy, or in the alternative, a declaration that the proxy would be revocable when the Note is satisfied.

For the reasons that follow I conclude that the proxy was irrevocable when created and, putting wholly aside any effect of the purported purchase of the shares by the Company pursuant to the proposed settlement of Ronald's option litigation, remains so. By this I mean to express the opinion not only that Herbert Haft held a security interest in the stock, but that beyond that he had and has sufficient interests with respect to Dart to support the present irrevocability of the proxy without regard to his interest as a secured creditor of Ronald Haft. Thus I conclude that the purported revocation was without legal effect.

## II. The Proxy Was Irrevocable When Granted

In order for Ronald Haft to establish that the proxy has been validly revoked, he must first show that the proxy, which on its face purports to be irrevocable, is in fact revocable under Delaware law. For the reasons set forth in this section I conclude that at the time that Ronald Haft purported to revoke the proxy it was irrevocable in law and that the revocation was therefore without legal effect.

Under Section 212(e) of the Delaware General Corporation Law, a proxy is irrevocable "if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power." The obvious first candidate for an "interest" that would support the irrevocability of the proxy in this instance would be a security interest in the stock protecting Herbert's right to be paid the principal amount of the Note, plus interest. The parties agree that a security interest in the stock itself would be sufficient to support an irrevocable proxy.[3] They disagree, however, on the more basic question, whether any security interest in the Class B shares was created in this instance.

### 1. The Parties Created a Security Interest in the Class B Shares Under Delaware Law.

It is agreed that Delaware law governs the question whether a security interest was created.[4] The applicable law is Articles 8 and 9

in this suit, been voluntarily dismissed. *See* note 1 above.

3. *See, e.g., In re Chilson,* Del.Ch., 168 A. 82, 85 (1933); 5 Fletcher Cyc. Corp. § 2062 (Perm. ed. 1987) ("The interest necessary in order to support irrevocability may be security for a loan . . .").

4. In the Transfer Contract, the parties agreed that Delaware law would govern any claims or rights arising from the transaction. However, the Note provides the basis for the claimed security interest and it indicates that it shall be governed by the laws of the District of Columbia. Moreover, for certificated securities, Article 9 of the Delaware Uniform Commercial Code, section 9–103(1)(b), indicates that perfection of a security interest is governed by the law of the jurisdiction "where the collateral is when the last event occurs on which is based the assertion that the

of the Delaware version of the Uniform Commercial Code. Article 9 generally governs the creation, perfection, and enforcement of security interests in property and applies to "any transaction (regardless of its form) which is intended to create a security interest in personal property." 6 *Del.C.* § 9–102(1)(a) (1991). Security interests in share certificates (or certificateless shares for that matter) are not excluded from its provisions. *See* 6 *Del.C.* § 9–104 (1991). Thus, in determining the validity of a claimed security interest in securities, one must turn first to Article 9.

(a). *Intent to create the security interest*:

█ A security interest is a property right in identified property created by contract for the purpose of protecting in some respect some right, title, or interest of the secured party. Recognizing the fundamental fact that security interests result from the contractual act of a grantor, Ronald Haft asserts that he, as the property owner (after the transfer of the stock) had no intention at the time he gave the proxy that it should be held and used to protect any right, title, or interest of Herbert. He presents his own sworn affidavit to that effect and points to the fact that after the closing of the July 1993 transfer his father presented him with a formal security agreement, which he did not sign.

█ It is elementary that the intention necessary to form a contract is not found in the private subjective mental state of either of the parties to a negotiation, but is the meaning that a reasonable person would attribute to their expressions of assent, given the context of the words and acts that preceded their claimed agreement and culminated in it. Thus, courts do not look for and give legal force to a private subjective state of mind (intent) but to objective acts (words, acts and context) that constitute the enforceable contract and the "objective" (reasonable person) interpretation of what the contracting parties meant (intended) to do. *See Leeds and Parkview Convalescent Ctr., Inc.*

*v. First Allied Connecticut Corp.,* Del.Ch., 521 A.2d 1095 (1986). Looking to the objective evidence reflected in the record, I find no material dispute concerning the relevant circumstances surrounding the transfer. The intent that the law requires for the creation of a security interest is, in my opinion, certainly present here.

█ The most important circumstance is the clear language of the operative legal document executed by Ronald Haft. The Note contains a paragraph entitled "Collateral" in which it states that *the note "shall be secured solely by the collateral, the Shares."* This language is part of an effective legal act that created rights. In light of this language in a signed document, no inconsistent private reservation is effective to create a material issue of fact concerning "intent" to create a security interest. No magic words are needed to create a security interest. *United Virginia Bank/Seaboard Nat'l v. B.F. Saul Real Estate Inv. Trust,* 641 F.2d 185, 189 (4th Cir. 1981). Under the objective theory of contracts, when a writing is clear, "the writing itself is the sole source for gaining an understanding of intent." *City Investing Co. Liquidating Trust v. Continental Cas. Co.,* Del. Supr., 624 A.2d 1191, 1198 (1993).

Notwithstanding the terms of the Note, Ronald now argues that Herbert's repeated subsequent attempts to get him to sign a prepared draft of a pledge agreement and his later refusal, evidence the fact that there was no intent to create a security interest at the time the Note, Contract, and Proxy were originally executed. Such evidence is, however, legally irrelevant given the legal standard referred to above. In other circumstances such conduct might create a fact issue, but here, given the terms of the Note itself, this extrinsic evidence creates no litigable issue with respect to the question whether the parties acted in a way in which a reasonable person would have concluded that they intended to create a security interest.

security interest is perfected or unperfected." In this case, that jurisdiction appears to be the District of Columbia. Thus, it may be that the laws of the District of Columbia should control. Nonetheless, the District of Columbia and Dela-

ware have adopted the Uniform Commercial Code without changes to the provisions germane to this issue and therefore this court will adhere to the parties' agreed-upon application of Delaware law.

**(b) *The Security Interest is Enforceable:***

Given the existence of an agreement to grant a security interest, Section 9–203 lays out the formal requisites of the enforceability of such an interest. Generally a security interest created by agreement is enforceable when (1) the debtor has rights in the specific collateral, (2) value is given by the creditor and (3) the collateral is identified either by possession of the creditor or description in a signed security agreement. Section 9–203, however, also provides that it is "subject to the provisions of . . . Section 8–321 on security interests in securities." Thus, in order for a security interest in securities to attach and be enforceable it must satisfy the requisites of Section 8–321.

Under Section 8–321(1), where the collateral is a security, it is insufficient, in order for the security interest to attach and be enforceable, simply to identify the collateral. In the context of securities, the collateral must be "transferred": "a security interest in a security is enforceable and can attach only if it is transferred" to the secured party or a person designated by him pursuant to a provision of Section 8–313(1).[5]

**(i) *Transfer of securities to "a person designated by" the secured party under Section 8–313(1).***

■ In contending on this motion that no security interest was created, Ronald Haft contends that no transfer occurred that would satisfy the requirements of Section 8–313(1) described above. The record, however, shows that the multi-part test for creation of a security interest in securities was satisfied when Herbert Haft accepted the Note and the proxy in partial payment for his transfer of the Class B stock to Ronald and the shares were delivered to Herbert's attorneys at Wilmer, Cutler & Pickering.

Section 8–313(1) provides several ways in which such a transfer may occur. With respect to certificated securities (as here), where the transfer does not involve a financial intermediary, subsections (a), (e), (h)(ii), and (i) of section 8–313(1) are all valid methods of satisfying the requirement of a transfer to the secured party or a person designated by him.[6] Principally involved in this case is the process defined by subsection (a). That subsection simply requires possession of the certificated securities by the secured party or a person designated by him. The critical question thus becomes who was in possession of the share certificates following the transaction and in what capacity.

It is agreed that the firm of Wilmer, Cutler & Pickering ("WC & P") has held and continues to hold the certificates. The capacity in which WC & P holds the shares is, however, actively disputed. Herbert Haft contends that WC & P were his lawyers and hold the shares as his agent. If Herbert is correct in this view then the requirements of Section 8–313(1)(a) would be satisfied and he would have an enforceable security interest in the Dart Class B stock. Ronald Haft, however, asserts that WC & P actually held the shares for him for safekeeping and not for his father. If Ronald is correct about this no security interest was created. Both parties admit, however, that WC & P has stated, and is of the belief that, it holds the shares as escrow agent for and as an accommodation for both parties.

**(ii) *Evidence with respect to the capacity in which WC & P possesses the Class B shares.***

In my opinion, there is insufficient evidence to raise a triable issue concerning Ronald's position that the law firm holds the shares for him solely. The Transfer Contract specifically states that WC & P represented Herbert in the transaction. Although WC & P's own statement that they hold the shares for both men may be thought to con-

---

5. Under the terms of Subsection 8–321(2) "a security interest so transferred pursuant to agreement by [1] a transferor who has rights [2] to a transferee who has given value is . . . perfected."

6. Subsection (e), however, is not applicable under the current circumstances because it con-

cerns a situation in which a third party had possession of the securities prior to the granting of a security interest and the third party continues to possess the securities for the secured party after the transaction. *See* 6 *Del.C.* § 8–313(1)(e) (1991).

tain a possible contradiction of this,[7] the most that can be made of that circumstance is that a trial might be necessary to determine if WC & P holds as Herbert's agent or as agent of both men. Crucially, however, there is no evidence that WC & P ever held the stock for Ronald alone. The Transfer Contract specifically states not only that WC & P represented Herbert but that Ronald had separate counsel. Even taking into account the fact, as asserted by plaintiff, that WC & P may have represented Ronald on other matters, retention of the shares by Herbert's counsel in the transaction is wholly inconsistent with any claim that Ronald retained unrestricted access and possession of the shares. The record is devoid of any evidence of plaintiff's contention other than his own conclusory affidavit. This record does not create a triable issue on the assertion that WC & P have acted solely for Ronald.

The Supreme Court of the United States has noted that summary judgment is appropriately granted even where "colorable ... or [in]significantly probative [evidence]" is present in the record, if no reasonable trier of fact could find for the plaintiff on that evidence. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S.Ct. 2505, 2510-11, 91 L.Ed.2d 202 (1986) (citations omitted). The "mere existence of a scintilla of evidence in support of the plaintiff's position" is not sufficient. *Id.* at 252, 106 S.Ct. at 2512. In my opinion, for similar reasons, plaintiff's affidavit standing alone does not raise a genuine issue of fact with respect to the factual claim that WC & P held the certificates solely for him.

Thus, the factual predicate for resolution of the question whether there was compliance with Section 8-313(1)(a) is either (1) WC & P represented Herbert alone when it took possession of the certificated shares of Dart Class B stock *or* (2) it represented both Herbert and Ronald. There is substantial evidence that would support either finding. For the reasons that follow however, I am of the opinion that under either finding Herbert's interest in the B stock would consti-

tute an enforceable security interest under Section 8-321.

### (iii) *WC & P was "designated" by Herbert Haft whether that firm acted for Herbert alone or jointly for both men.*

In my opinion the requirements of section 8-313(1)(a) are met in either event because under either scenario the principal purpose of the possession requirement—to place potential creditors on notice that the shares may be encumbered—is satisfied.

Ronald contends that if WC & P holds the shares for *both* Ronald and Herbert, the requisite transfer to a "person designated by" Herbert did not occur. First, I note that on the most literal level of analysis, an escrow agent who acts for two principals, both of whom agree to the terms of the arrangement, qualifies as a "person designated by" either such person. More fundamentally, however, the underlying purpose of the transfer/possession requirement is satisfied when the words in question are given this ordinary meaning interpretation. Notice of the creation of rights in the collateral is the primary purpose served by the possession requirement. Placing securities in the hands of an escrow agent serves this notice function by alerting third parties that the debtor does not have unfettered control over (cannot deliver) the securities. Ronald's relinquishment of the shares to WC & P to hold as an accommodation for both parties would constitute a transfer to a "person designated by" Herbert as required under sections 8-321 and 8-313(1)(a).

\* \* \* \* \* \*

Thus concluding that the requisite elements for the creation of a security interest in the Class B shares were satisfied, I conclude that the proxy when granted was coupled with an interest in the stock and thus its stated irrevocability was a valid and enforceable term of the parties' agreement. Insofar as plaintiff's motion is premised on a different view, that motion must be denied.

---

**7.** But not necessarily so, as it is possible that WC & P represented Herbert in the transaction, but agreed with his concurrence after the closing, to accommodate the needs of the parties by acting as an escrow agent for both parties.

### III. The Proxy Is Irrevocable Irrespective of any Satisfaction of the Note

■ With respect to Ronald's claim that the Proxy will be revocable once the Note is paid in full, I conclude that Herbert Haft's interests in Dart other than as a person with a security interest in the transferred Class B shares, are sufficient to render specifically enforceable the contractual undertaking of irrevocability.[8]

#### 1. The Applicable Statute:

The Delaware General Corporation Law states that a proxy may be made irrevocable "if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power." 8 *Del.C.* § 212(e) (1991). Most agency powers are, of course, terminable by the grantor of the power at will. Irrevocable powers or powers in which the holder has a property right are an exception. The *Restatement (Second) of Agency* formulation is conventional: an irrevocable power or "power given as security" is "a power ... held for the benefit of the power holder ... and given to secure the performance of a duty or to protect a title, ... such power being given when the duty or title is created or given for consideration." *Restatement (Second) of Agency* § 138 (1957). Generally, of course, irrevocable powers arise in transactions in which the "agent" bargains for or requires the power as a means of protection of her own legally protectable interest.

In this case, Herbert Haft asserts that he required the irrevocable proxy in order to protect both his right to be paid the cash due on the Note and as a means to protect his interests in Dart, which included his interest as holder of Class A stock, and as the CEO of the company. It was of course obvious that if he were to sell his majority block of the Class B shares, without retaining (in effect) the vote, he would open himself to a number of risks: such as the possibility of a merger, recapitalization, or other transaction that disadvantaged him as the holder of a security interest in the B stock, or more pointedly, the possibility of his removal as the firm's CEO by a board that would no longer have to look to him for reappointment. The vote offered no surefire protection against such steps, but it certainly offered substantial protection.

Under the Delaware corporation law (§ 212(e)) an interest sufficient to support an irrevocable proxy must be either "an interest in the stock itself or an interest in the corporation generally." 8 *Del.C.* § 212(e) (1991). Do Herbert Haft's interests, other than as a secured creditor, qualify under the statute? As I now explain, in my opinion they do.

#### 2. Relevant Legal Precedents

The predecessor of Section 212 was amended as part of the general revision of the Delaware General Corporation Law in 1967. The language in question ("an interest in the corporation generally") was introduced into our statute at that time. The apparent purpose for doing so was to erase the implication arising from dicta in a 1933 Master's Report, which had been confirmed by this court. The report was in the case of *In re Chilson*, Del.Ch., 168 A. 82 (1933). The *Chilson* dicta was to the effect that in order to support irrevocability of a proxy, the holder had to have an interest in the stock itself. There was then and later a dearth of decided cases on this point and, as a consequence, *Chilson's* pronouncement commanded respect, despite its status as dicta. *See* Drexler, Black, & Sparks, DELAWARE CORPORATE LAW and PRACTICE at § 25.09[2] (1993). This effect was, however, arguably dissipated by the enactment of new § 212(e) in 1967, which made it very clear that other interests (interests other than in the stock itself) could legitimately be contractually protected by the grant of an irrevocable proxy.

Prior to the 1967 revision the question whether the interest of a CEO in his position was such an interest as, standing alone, would support the enforceability of the agreed-upon irrevocable proxy according to its terms had occasionally been addressed by courts in other jurisdictions. In *Deibler v.*

---

8. Although Herbert Haft's security interest in the Class B shares in and of itself makes the Proxy irrevocable at this time, events occurring subsequent to the parties' cross motions for summary judgment make it prudent to address this issue. *See* note 1 above.

*Chas. H. Elliott Co.*, 368 Pa. 267, 81 A.2d 557 (1951), the Pennsylvania Supreme Court, applying Delaware law, held that an irrevocable proxy given to the seller of corporate stock both to secure payment for the stock and to protect his on-going contract of employment with the corporation, remained irrevocable after the note had been paid. The court accepted the argument that the on-going employment contract constituted a sufficient interest to specifically enforce the agreement made. A similar result had been reached by the Supreme Court of Michigan in 1947: *Ecclestone v. Indialantic, Inc.*, 319 Mich. 248, 29 N.W.2d 679 (1947).

### 3. Policy Considerations:

No Delaware court has been required to address this question under the language of amended Section 212. In now doing so, it is appropriate to acknowledge that the corporate law has tended to distrust and discourage the separation of the shareholder claim as equity investor (i.e., the right to enjoy distributions on stock if, as, and when declared) from the right to vote stock. For example there was for many years a rather clear rule against the sale of a corporate vote unattached to the sale of the underlying stock.[9] A powerful argument can be advanced that generally the congruence of the right to vote and the residual rights of ownership will tend towards efficient wealth production.[10]

A proxy is, of course, a means temporarily to split the power to vote from the residual ownership claim of the stockholder. In the vast number of instances in which proxies to vote stock are used, however, this split occasions no significant divergence between the interests of the proxy holder and the holder of the residual corporate interest because the proxy is of relatively short duration and in all events is revocable unilaterally. Thus, in effect, the grant of the proxy represented a judgment (which may be enforced through revocation) that the holder of the proxy will exercise it in the economic interest of the residual owner. A potentially inefficient split between the interests of the voter and the interests of the residual owners may, however, develop when the proxy is irrevocable. Such a holder is free from the unilateral control of the grantor and may be expected to be inclined to exercise voting rights in a way that benefits himself. There is of course, as a general matter, nothing legally suspect in contracting parties exercising contracted for rights in a self-interested manner.[11] Yet the exercise of voting control over corporations by persons whose interest in them is not chiefly or solely as a residual owner will create circumstances in which the corporation will be less than optimally efficient in the selection of risky investment projects.[12] (A simple, if gross, example: the holder of an irrevocable proxy with voting

---

9. *See Macht v. Merchants Mortgage & Credit Co.*, Del.Ch., 194 A. 19 (1937); *Hall v. John S. Isaacs & Sons Farms*, Del.Ch., 146 A.2d 602 (1958), aff'd, Del.Supr., 163 A.2d 288 (1960); *Chew v. Inverness Mgt. Corp.*, Del.Ch., 352 A.2d 426 (1976). More recently courts have recognized some circumstances in which there is neither fraud nor unfairness present in a transaction which may entail consideration for voting. *E.g. Schreiber v. Carney*, Del.Ch., 447 A.2d 17 (1982). We continue, however, to have in mind the problems that made the original prohibition useful. *See Commonwealth Assoc. v. Providence Health Care, Inc.*, Del.Ch., 641 A.2d 155, 157–58 (1993) (law will assume contract to give proxy where after record date sale of stock occurs).

10. *See* Robert C. Clark, *Vote Buying and Corporate Law*, 29 Case Western Res.L.Rev. 776 (1979); Frank Easterbrook & Daniel Fischel, *Voting in Corporate Law*, 26 J.L. & Econ. 395 (1983).

11. I note that this statement is subject to qualification in at least three circumstances: (1) a contract between a fiduciary and the person or entity for whom she acts (the "trust" or "corporation" etc); (2) a contract between a fiduciary and a person who is an express beneficiary of the "trust" etc., if the contract relates to the business of the "trust" and (3) an implied obligation of good faith and fair dealing, which under certain circumstances will be found to impose a limitation on a arm's-length contracting party's ability to exercise legal rights in a way that deprives the other contracting party of the substance of the express bargain that the parties had reached. On the last see *Corbin on Contracts* § 570 (Cunningham & Jacobson Supp.1994); *Katz v. Oak Indus. Inc.*, Del.Ch., 508 A.2d 873, 880 (1986).

12. Alchian & Demsetz, *Production, Information Costs, and Economic Organizations*, 62 Am. Econ.R. 777 (1972); Michael Jensen & William Meckling, *Theory of the Firm, Agency Costs, and Ownership Structure*, 3 J.Fin.Econ. 305 (1976).

control might simply refuse to elect a board that will accept the best investment projects (those with the highest risk adjusted rate of return) unless some side payment to him is arranged). The special additional costs associated with such a divorce between ownership and voting (the costs being expressed either as an otherwise unnecessary expense or as the selection of non-optimizing investment projects) will of course tend to diminish as the voter's interest becomes aligned with the residual owners interest.

In this light, the dicta of *In re Chilson* may be thought to offer a means of limiting the agency costs that irrevocable proxies occasion. By recognizing only an interest in the stock itself as an interest that will support the irrevocability of a proxy, the rule of *Chilson* would eliminate a class of cases in which the incentives of the proxy holder to exploit the corporation would be greatest, that is, those in which she simply has no economic interest at all in the residual equity of the firm. Of course the *Chilson* rule does not entirely eliminate the inefficient incentive structure that the divorce of voting power and benefit occasions; the proxy voter/secured lender still is a creditor and thus may not be inclined to accept high-risk/high-reward projects, even if they have a positive risk-adjusted net present value.[13] But the *Chilson* rule would moderate the effect.

## 4. Fashioning a Rule of Judicial Decision:

In the field of corporation law, courts have for centuries played and do still play an enormously important role in creating that law interstitially through the accretionary process of case by case rulings. Indeed the doctrine of fiduciary duty and the *ex post* protection against investor exploitation it offers, arguably provides an important support for the basic utility of the public corporation. When, in the absence of authoritative text or precedent, courts are modernly called upon to fashion corporate law rules interstitially, it is appropriate for the court, among other considerations, to consider the future effects generally of alternative rules and, in doing so, to consider especially the efficiency effects of those alternatives, to the extent they can reliably be detected. Thus, reasoning of the foregoing kind is not inappropriate to the institutional role of courts. But while not inappropriate, rarely will such reasoning directly produce an applicable rule or a ruling. To state what I would suppose is obvious, the corporate law, as applied in specific cases by courts, is institutionally a rich stew; the corporation law's underlying efficiency concerns are mediated through a body of authoritative rules, principles and practices to which courts owe loyalty. In this instance I confess to the view that a corporation law rule allowing for the specific enforceability of an irrevocable proxy that is coupled only with the holder's interest in maintaining a salaried office seems mischievous in terms of its possible efficiency effects.[14] But in light of the 1967 amendment to the Delaware statutory law, the existence of the *Deibler* and *Ecclestone* opinions,[15] and the absence of contrary

---

**13.** The reasoning is well-known. I gave an example of the reasoning (from the converse perspective of the owner-voter) in *Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications Corp.*, Del.Ch., C.A. No. 12150, 1991 WL 277613, Allen C. (Dec. 30, 1991), Mem.Op. fn. 55.

**14.** One response to this might be to suggest that this tendency could be moderated by incentive compensation plans. Another response, which I raise but don't discuss, would be to assert that both parties may have understood (should have understood if they were alert) all of this at the outset. Therefore the price at which proxy was granted impounded a discount to account for the likelihood that the company would be managed less efficiently because of this structure. Thus on this view there is no fairness problem between the parties themselves in enforcing a contract granting an irrevocable proxy even though an

other arrangement (i.e., having residual owner vote) might now seem more likely to be efficient. Indeed, on this view, to fail to specifically enforce the contract would simply allow the buyer to have the property for which the proxy served as partial consideration at a discount price but deprive the seller of the consideration (proxy) for which he gave the discount.

**15.** I note that the Restatement (Second) of Agency, § 138 comment b., in addressing the question, what sort of interest in the holder of a power would support the specific enforcement of an irrevocability term, states:

On the other hand, if an agent has an interest in the subject matter, as where he engages in a joint enterprise in which another supplies the subject matter, a power given him by the other to protect such interest is a power given as security [which may be made irrevocable].

precedent, I am required to express the opinion that such an interest—the interest that Herbert Haft had and retains as the senior executive officer of Dart—is sufficient under our law to render specifically enforceable the express contract for an irrevocable proxy. So concluding, I thus have no need to address the effect of his ownership of a block of non-voting Class A Dart stock. The record indicates that that stock is pledged to secure repayment of a now-defaulted loan, so that, as an interest supporting the irrevocability of the proxy, it involves complexities which need not be addressed in this opinion.

Plaintiff's motion for summary judgment will therefore be denied.

This comment would presumably reach one who provides management skill while another contributes capital.