IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BRADLEY DANIEL, an individual, and MEDAPPROACH HOLDINGS, INC., a Delaware corporation, | § | |
| | § | No. 184, 2022 |
| Defendants Below, Appellants, | § | |
| | § | Court Below: Court of Chancery |
| v. | § | of the State of Delaware |
| | § | |
| SHARON HAWKINS, individually and derivatively on behalf of MEDAPPROACH, L.P., | § | C.A. No. 2021-0453 |
| | § | |
| Plaintiff Below, Appellee. | § | |

Submitted: November 2, 2022
Decided: January 6, 2023

Before **VALIHURA**, **VAUGHN**, and **TRAYNOR**, Justices.

Upon appeal from the Court of Chancery. **AFFIRMED**.

David Teklits, Esquire (*argued*), Sara Barry, Esquire, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware; *Of Counsel*: Jeffrey Alan Simes, Esquire, Goodwin Proctor LLP, New York, New York for Appellants.

Richard I.G. Jones, Esquire (*argued*), John G. Harris, Esquire, Berger Harris LLP, Wilmington, Delaware for Appellee.

**VALIHURA**, Justice:

Following a trial, on April 4, 2022, the Court of Chancery entered judgment in favor of appellee Sharon Hawkins ("Mrs. Hawkins" or "Appellee") on her request for a declaration that the irrevocable proxy which provides appellant W. Bradley Daniel ("Daniel")[1] with voting power over all 100 shares of N.D. Management, Inc. ("Danco GP") (the "Irrevocable Proxy"), does not bind a subsequent owner of such Danco GP shares. The Court of Chancery also held that an addendum to the Irrevocable Proxy does not obligate the current owner of the Danco GP shares, MedApproach, L.P. (the "Partnership"), to demand that the buyer in a sale to an unaffiliated third party bind itself to the Irrevocable Proxy.

The Irrevocable Proxy was executed on February 5, 1997 by the then-owner of all 100 shares of issued and outstanding stock of Danco GP. It granted three individuals, including Daniel, the power to vote the Proxy Shares (defined below). On January 1, 1999, as part of an internal restructuring in which the Partnership was created and acquired 75% of the Proxy Shares, the Partnership executed an Agreement To Be Bound By Irrevocable Proxy and Power Of Attorney, binding itself to the Irrevocable Proxy.[2]

The Partnership dissolved on February 28, 2021, and is now in the process of winding up. As its principal asset, it owns 75% of the issued and outstanding stock of Danco GP (the "Majority Shares"). Appellee currently owns 88% of the Partnership and

---

[1] MedApproach Holdings, Inc., referred to herein as "Holdings" is also named as a defendant. Daniel owns 100% of Holdings.

[2] App. to Opening Br. at A370 (Agreement To Be Bound By Irrevocable Proxy and Power of Attorney).

desires to purchase the Majority Shares in the winding up process. But for the Irrevocable Proxy, the owner of the Majority Shares would control both Danco GP and the entity managed by Danco GP, Danco LP (defined below).

Daniel appeals the Court of Chancery's judgment that the Irrevocable Proxy does not run with the Majority Shares.[3] He argues that the Court of Chancery committed the following legal errors: (1) *first*, rather than interpret and apply the plain language of the Irrevocable Proxy as written, the Court of Chancery erred in relying on the Restatement (Third) of Agency, which was not adopted until nearly a decade after the parties entered into the Irrevocable Proxy, (2) *second*, it read additional language into the Irrevocable Proxy in order to support its finding that the broad "catch-all" language that the parties included to prevent termination of the Irrevocable Proxy did not encompass a sale of the shares, and (3) *third*, it did not give effect to all of the terms of the Irrevocable Proxy and it improperly limited the assignment clause of the Irrevocable Proxy so as not to bind assigns of the stockholder.

For the reasons set forth below, we **AFFIRM** the judgment of the Court of Chancery.

---

[3] Daniel does not challenge the Court of Chancery's conclusion that the Addendum does not obligate the Partnership to demand that the buyer in a sale to an unaffiliated third party bind itself to the Irrevocable Proxy.

## *I. FACTUAL AND PROCEDURAL BACKGROUND*[4]

### *A. The Founding of the Project*

Population Council, Inc. ("Popco") is an international not-for-profit corporation focused on family planning. In 1994, a French pharmaceutical company granted Popco a license to manufacture, market, and distribute the oral abortion drug RU-486, more commonly known as mifepristone. Once granted the license, Popco began a search for an investor to manufacture and distribute the drug for domestic and international use (the "Project"). In what would turn out to be an unfortunate choice, Popco selected Joseph D. Pike ("Pike"), who it had previously worked with on similar ventures, to undertake the Project.

Pike formed a complex entity structure to consummate the venture, placing himself at the helm. He formed Danco Laboratories, Inc., a Cayman Islands company ("Danco Labs") as the main operating entity. Danco Labs subsequently domesticated into a Delaware limited liability company and is now known as Danco Laboratories, LLC. Through an affiliate, Popco granted an exclusive sublicense to Danco Labs to implement the Project in the United States.[5] Ultimately, the outcome of this litigation will determine the control arrangement of Danco Labs.

Pike then formed Neogen Investors L.P., a California limited partnership. Neogen Investors L.P. is now known as Danco Investors Group, L.P. ("Danco LP"). Danco LP

---

[4] Unless otherwise noted, facts are taken from the Court of Chancery's memorandum opinion. *See Hawkins v. Daniel* (*Chancery Opinion*), 273 A.3d 792 (Del. Ch. 2022).

[5] App. to Opening Br. at A132 (Offering Memorandum at 1).

owns 100% of Danco Labs and was formed as a holding company to raise equity financing for the Project. Pike's goal was to solicit investors to invest in Danco Labs by purchasing limited partnership interests in Danco LP.

Lastly, Pike formed N.D. Management, Inc., a Cayman Islands company ("Danco GP") as Danco LP's general partner. Danco GP has since domesticated into a Delaware corporation. Initially, Pike owned 100% of Danco GP, which consists of 100 shares of issued and outstanding stock. Because Danco GP controlled Danco LP as its general partner, and Danco LP owns 100% of Danco Labs, Pike effectively controlled Danco Labs through his 100% ownership of Danco GP. The same remains true today: whoever controls Danco GP controls Danco Labs and the Project.

Pike then began raising money for the Project by selling limited partnership interests in Danco LP. From about November 1995 to February 1997, Pike raised approximately $13.35 million.[6] One of Pike's primary investors was appellant Daniel. Daniel invested in Danco LP through his newly formed entity MedApproach L.P., a Tennessee limited partnership ("Old MedApproach"), which he caused to purchase limited partnership interests in Danco LP. At the time, Daniel owned Old MedApproach through its general partner, Bio-Pharm Investments, Inc., a Tennessee corporation. Bio-Pharm Investments, Inc. has since become defendant below-appellant Med Approach Holdings, Inc., a Delaware corporation ("Holdings"). Daniel owns 100% of Holdings. In 1999, Old

[6] *Id.* at A135 (Offering Memorandum at 4).

MedApproach was restructured and divided into three separate entities, one of which is the Partnership.

Around this time, Daniel was introduced to Mrs. Hawkins' husband, Gregory Hawkins ("Mr. Hawkins") through a family connection who suggested that the two discuss the Project. After discussing the opportunity with Daniel, Mr. Hawkins decided to invest. Instead of purchasing limited partnership interests directly in Danco LP, Mr. Hawkins invested by purchasing limited partnership interests in Daniel's entity, Old MedApproach. Old MedApproach then used the money invested by Mr. Hawkins to purchase limited partnership interests in Danco LP. After investing $1.5 million, Mr. Hawkins owned approximately 75% of the limited partnership interests in Old MedApproach. Three years later, Mr. Hawkins transferred his interest in Old MedApproach to his wife, appellee here, due to personal financial difficulties. As between Mr. Hawkins and Mrs. Hawkins, Mr. Hawkins was substantively involved in the Project at the relevant time period and, as such, gave the substantive testimony before the Court of Chancery.

*B. The Downfall of Joe Pike*

In May 1996, Pike pled guilty to misdemeanor forgery charges in North Carolina arising out of a 1985 transaction. He was disbarred from practicing law in the State of North Carolina and faced criminal penalties. Pike's legal trouble was news to Popco. Pike had failed to disclose any legal difficulties or the underlying events to both Popco and investors in Danco LP. Further, Popco believed that Pike had misled investors about potential uses of their investment and the payment of fees, and various other aspects of the Project. To avoid jeopardizing the Project, Popco sought to extract Pike from the Project

as quickly as possible. In November 1996, Popco filed a complaint in New York state court requesting that the court remove Pike from his leadership roles and rescind his interest in the Project.[7] It also threatened to cancel the sublicense it had granted to Danco Labs. On December 11, 1996, in the face of this existential threat, Pike, Project investors, and Popco met to determine if there was a path forward.

Pike, Popco, and the investors in Danco LP were all represented at the meeting. The Project investors were represented by five individuals selected from among their ranks: Daniel, Brian Freeman, Jeff Rush, Richard Cusac, and William Elkus (the "LP Representatives"). As representatives, they would present any agreement reached with Pike and Popco to the remaining investors for their review and approval.[8]

Freeman and Rush owned limited partner interests directly in Danco LP. They also had solicited additional investors for the Project and served as advisors to Pike. Cusac and Elkus owned limited partner interests directly in Danco LP as well, but the record is limited as to any further involvement they may have had in the Project.[9]

Daniel represented Old MedApproach at the meeting. Having chosen not to attend the meeting due to the political climate and controversy surrounding mifepristone, Mr. Hawkins relied on Daniel for news of the negotiations with Pike and Popco. Daniel communicated regularly with Mr. Hawkins, sought his input, and kept him apprised of developments.

---

[7] *Id.* at A205 (Offering Memorandum at 75).

[8] *Chancery Opinion*, 273 A.3d at 799.

[9] *Id.*

At the negotiating table, Popco put forth two demands. *First*, Popco reiterated the demand it made in its November suit: It wanted to expel Pike from any control or management of the Project. Because Pike held his interest in Danco LP through Danco GP, this would mean, among other things, Pike would have to sell at least a majority of his 100 shares of Danco GP and relinquish the voting rights to all 100 shares. *Second*, Popco wanted to ensure that existing Danco LP investors would have the opportunity to rescind their investment. Popco feared that the failure to disclose Pike's legal trouble to investors and certain actions taken by Pike constituted a violation of federal and state securities laws and wanted to cure a potential violation through a rescission offer.[10]

*C. The Settlement Agreement*

By the end of January 1997, the LP Representatives reached an agreement with Popco and Pike that would achieve Popco's goals and allow the Project to move forward. The terms of the deal were memorialized in an agreement entitled Agreement Regarding Neogen Project, dated January 21, 1997 (the "Settlement Agreement").

Answering Popco's first demand, Pike agreed to resign from all of his roles in the Project, to sell 75% of his equity interest in the Project, and to give up the voting rights allied with the 25% equity interest he was allowed to retain. In other words, Pike had to sell the Majority Shares, and, although he could keep the economic rights to the 25 remaining shares (the "Pike Shares"), he had to give up their attendant voting rights.

[10] *See* App. to Opening Br. at A136, A156–57 (Offering Memorandum at 5, 25–26).

The Settlement Agreement provided that, in return for exiting from the Project, selling the Majority Shares, and giving up voting rights to the Pike Shares, Pike was contractually entitled to payment of 50% of the distributions on the Majority Shares, up to a cap of $21.875 million.[11] As an advance on the distributions, Pike received an upfront loan in the amount of $3.5 million (the "Pike Loan"), which Pike would repay from the first $3.5 million of the distributions.[12] Pike also received a consulting agreement that would pay him $300,000 per year for five years.[13]

Pike's side of the exchange presented timing issues for the deal. Pike's sale of the Majority Shares was contingent on both the payment of the Pike Loan and the approval of the Settlement Agreement.[14] Once the Pike Loan was funded, Pike would resign all of his positions at any entity associated with the Project and transfer 49.9% of his shares in Danco GP.[15] Once Popco and the limited partners holding a majority of the interests in Danco LP approved the Settlement Agreement, Pike would transfer another 25.1% of his shares in Danco GP.[16] But Popco wanted Pike to transfer control of the Project as soon as possible so that it could cure the potential securities fraud violations and move forward with the Project. To solve this issue, Pike agreed to transfer voting power over all 100 of his Danco

---

[11] *Id.* at A021–22 (Settlement Agreement § IV(B)(1)(b)).

[12] *Id.* at A018–21 (Settlement Agreement §§ III(A), IV(B)(1)(a)).

[13] *Id.* at A021–22 (Settlement Agreement § IV(B)(2)(a)).

[14] *Chancery Opinion*, 273 A.3d at 800.

[15] App. to Opening Br. at A018–21 (Settlement Agreement §§ IV(A)(1)(a)(i), IV(A)(3)).

[16] *Id.* at A019 (Settlement Agreement § IV(A)(1)(a)(ii)).

GP shares as soon as he received the Pike Loan.[17] The vehicle for the immediate transfer of voting power was the Irrevocable Proxy. Through the Irrevocable Proxy, Pike irrevocably appointed Daniel, Freeman, and Rush (the "Holders") as his proxies to vote all 100 shares (the "Proxy Shares").

The Settlement Agreement also addressed Popco's second demand that the investors Pike had brought in be offered an opportunity to rescind their interests (the "Recission Offer"). The Recission Offer would be presented at the same time as an option for the limited partners of Danco LP to invest additional funds in the Project (the "Offering").

The terms of the Settlement Agreement created the need for capital to fund the Pike Loan and the Recission Offer. The Settlement Agreement contemplated that certain "Participating Investors" would provide the funds.[18] It defined Participating Investors as Old MedApproach, Rush, Freeman, Cusac, and Elkus, plus any other limited partners in Danco LP who agreed to sign on to the Settlement Agreement on or before January 31, 1997. Each Participating Investor would agree to fund an amount of the Pike Loan and of the Recission Offer in proportion to their relative interest in Danco LP. In exchange, they would receive their pro rata interest in the Majority Shares.

Finally, the Settlement Agreement contemplated that in the future, the Participating Investors could restructure the entities comprising the Project through the creation of a

---

[17] *Chancery Opinion*, 273 A.3d at 813 (finding that the Settlement Agreement "contemplated a complex series of transactions that would take time to implement," and that "[t]he solution was the Irrevocable Proxy, under which Pike immediately gave up his voting power over the Proxy Shares").

[18] App. to Opening Br. at A022–23 (Settlement Agreement § IV(D)).

"Newco."[19] It provided that the rights covered by the Irrevocable Proxy would inure to the interests in the Newco, which would be held by the Participating Investors.[20] The provision would allow the Participating Investors to replace the entity structure that Pike had created to give himself sole control over the Project with a conventional corporate governance structure once Pike was out of the picture.

### *D. The Solicitation of the Limited Partners' Approval of the Settlement Agreement*

By its terms, the Settlement Agreement had to be approved by both Popco and a majority of the interests in Danco LP on or before February 5, 1997, and would only become effective upon such approval.[21] The Settlement Agreement also provided that the limited partners of Danco LP would have the opportunity to become Participating Investors if they joined the Settlement Agreement before January 31, 1997. This imposed on the LP Representatives a tight timeline to solicit the consent of the limited partners of Danco LP to the Settlement Agreement and to offer them the opportunity to become Participating Investors.

The LP Representatives circulated a short memorandum, dated January 24, 1997, to the limited partners of Danco LP that described the Settlement Agreement and the offer to become Participating Investors ("the Settlement Memorandum").[22] It asked the limited

---

[19] *See id.* at A019–20, A022–23 (Settlement Agreement §§ IV(A)(2), IV(D)).

[20] *Id.* at A020 (Settlement Agreement § IV(A)(3)).

[21] *Id.* at A018 (Settlement Agreement § III(A)).

[22] *Id.* at A025 (Settlement Memorandum).

partners to sign and return a form by January 31, 1997 indicating whether they consented to the Settlement Agreement and whether they wanted to become Participating Investors.

The Settlement Memorandum briefly described the negotiations between the parties and the opportunity to become Participating Investors. It also informed the limited partners of Danco LP of the obligations they would incur under the Settlement Agreement if they chose to become Participating Investors. In addition to funding the Pike Loan, they would, on a pro rata basis, "provide to [Danco LP] up to $14 million additional capital contributions to 'top up' the capital of [Danco LP] to the $27.5 million level" originally contemplated by the Project documents.[23] Limited partners who chose to become Participating Investors would be informed of their proportional amount of the Pike Loan five days later, on February 5, 1997. They would be informed of their proportional share of the additional $14 million capital at an unspecified later date.[24]

*E. The Revised Settlement Agreement and the Addendum*

Between January 24 and January 31, 1997, the LP Representatives determined that giving the opportunity to purchase Pike's equity interests to all limited partners of Danco LP posed logistical and timing issues. Fearing that an extension of the timeline set by the Settlement Agreement would delay the deal, the LP Representatives entered into a revised settlement agreement (the "Revised Settlement") which provided, among other things, that only Old MedApproach would purchase the Majority Shares from Pike. None of the other

---

[23] *Id.* at A026 (Settlement Memorandum).

[24] *Id.* at A028 (Settlement Memorandum).

limited partners in Danco LP would become Participating Investors. The only Participating Investors, and the only counterparties to the Settlement Agreement, would be Old MedApproach, Freeman, and Rush. They entered into a letter agreement, dated February 4, 1997,[25] in which they agreed to an allocation of the funding commitment: Freeman and Rush each agreed to fund 25%, Old MedApproach agreed to fund the remaining 50%, and Mr. Hawkins agreed to backstop the liability of Old MedApproach.[26]

The Revised Settlement posed a problem for the Irrevocable Proxy. The Court of Chancery found that the purpose of the Irrevocable Proxy was to provide a temporary governance regime until Pike was expelled from the Project and a more conventional governance structure would be put in place, wherein shareholders would elect a board of directors to manage operations.[27] Through the Irrevocable Proxy, Pike was appointing Daniel, Rush, and Freeman as his proxy to vote the Majority Shares in his capacity as owner of the Majority Shares. But the Revised Settlement contemplated that Pike would turn over the Majority Shares to Old MedApproach alone, and not the existing limited partners of Danco LP who had chosen to become Participating Investors.[28] Popco wanted to make sure that Old MedApproach would be bound by the Irrevocable Proxy until the anticipated reorganization was complete.[29] To address the concern that the Irrevocable

[25] *Id.* at A030 (Financial Commitments in Respect of Neogen Project).

[26] *Chancery Opinion*, 273 A.3d at 802.

[27] *Id.* at 801; *see also* App. to Opening Br. at A519 (G. Hawkins Trial Testimony at 38).

[28] *Chancery Opinion*, 273 A.3d at 801.

[29] Daniel does not directly assert that the Court of Chancery's finding that the Irrevocable Proxy structure was not intended to be permanent was clearly erroneous. *Id.* at 804, 813, 818, 833–34, 835. Instead, he makes a number of assertions that, in our view, either merely state his contrary

Proxy would terminate when Old MedApproach bought the shares, Popco's counsel prepared an addendum to the Irrevocable Proxy that would explicitly bind Old MedApproach as the new owner of the Majority Shares (the "Addendum").[30] The Addendum is appended to the Irrevocable Proxy and was executed on February 5, 1997, the same day as the Irrevocable Proxy.[31] In it, Old MedApproach agreed to be bound by the Irrevocable Proxy at any time that it is a beneficial or record holder of any of the Proxy Shares and agreed not to transfer any such shares of Danco GP to any "MedApproach Person," unless such person agrees to be bound by the Irrevocable Proxy. MedApproach Person is defined as Old MedApproach, "or its affiliates, owners, designees, or nominees (or their respective successors or assigns)."[32]

---

view, or fail to demonstrate any error, let alone clear error, by the trial court. *See, e.g.*, Opening Br. at 13. These assertions rely in part on extrinsic evidence. However, the trial court found that the extrinsic evidence cut both ways. We respect the Court of Chancery's finding that heavy reliance on extrinsic evidence in this case would be untenable because of the considerable passage of time. It stated, "[a]lthough [Daniel and Mr. Hawkins] generally seemed credible, their testimony about negotiations that occurred over two decades ago was not sufficiently reliable to support factual findings without corroboration." *Chancery Opinion*, 273 A.3d at 833 n.45. Further, we conclude that the Court of Chancery's factual finding regarding the structure's temporary nature is supported by the record and is not clearly erroneous. Daniel's view is particularly weakened by the language of the Irrevocable Proxy itself. The Termination Provision in the proxy explicitly contemplates that it will terminate upon the creation of a Newco. App. to Opening Br. at A035 (Irrevocable Proxy at 2, ¶ 5).

30 *Chancery Opinion*, 273 A.3d at 811 (noting that after pivoting to the Revised Settlement, in which only Old MedApproach acquired the Majority Shares, "PopCo [] insist[ed] on a mechanism to bind Old MedApproach to the Irrevocable Proxy").

31 App. to Opening Br. at A034 (Irrevocable Proxy at 1).

32 *Id.* at A039 (Irrevocable Proxy at 5).

As requested by the LP Representatives,[33] a majority of the interests in Danco LP approved the Revised Settlement. Mr. Hawkins transferred the amount of the Pike Loan to Pike and on February 11, 1997, Pike acknowledged receipt, resigned from his leadership positions, and transferred the Majority Shares to Old MedApproach. The next day, the parties to the litigation initiated by Popco approximately three months earlier, filed a stipulation of dismissal, dismissing the action with prejudice.[34]

*F. The Recission Offer and the Offering*

After approximately a year-long delay largely due to the loss of Danco Labs' primary manufacturing contract, Danco LP launched the Recission Offer and the Offering by circulating a confidential offering memorandum to its limited partners on August 5, 1998 (the "Offering Memorandum").[35] The Offering Memorandum both informed limited partners of Danco LP about the Rescission Offer and sought to sell up to $27.5 million aggregate amount of limited partnership interests in Danco LP in the Offering. Of the $27.5 million, $13.35 million would be used to fund the Recission Offer to the extent limited partners chose to rescind, and at least the remaining $14.15 million would serve as additional funding for the Project.[36] The Offering Memorandum described the history of

[33] On January 31, 1997, the LP Representatives circulated a revised memorandum to the limited partners of Danco LP reflecting the changes and requesting their consent to (i) enter into the Revised Settlement, (ii) transfer interests in, and change control of, Danco GP, and (iii) transfer voting control of Danco GP to Daniel, Freeman, and Rush. *Id.* at A207 (Offering Memorandum at 76). The revised memorandum does not appear in the record, but it is described in the Offering Memorandum.

[34] *Id.* at A208 (Offering Memorandum at 77).

[35] *Id.* at A128, A190 (Offering Memorandum at 1, 59).

[36] *Id.* at A137 (Offering Memorandum at 6).

the Project, Pike's legal trouble, the Revised Settlement, and various Project risk factors, including risks relating to the control of Danco LP.[37] It disclosed that limited partners of Danco LP lacked control over the entity and the Project because they did not have voting rights.[38] Instead, Danco LP was managed and controlled exclusively by its general partner. As for Danco GP, the Offering Memorandum explained that it was "controlled by the [ ] Holders."[39] It also stated that:

> Pursuant to an Irrevocable Proxy and Power of Attorney, dated February 5, 1997, [Old MedApproach], Mr. Pike and his wife granted to Messrs. Daniel and Freeman and Dr. Rush . . . proxies to vote their respective interests in [Danco GP]. Accordingly, [Danco GP] is in effect managed by or under the direction of the [ ] Holders.[40]

Apart from disclosing the existence of the Irrevocable Proxy and the identities of the Holders, the Offering Memorandum was silent as to its terms. Importantly, it did not explicitly address whether the Irrevocable Proxy would bind any subsequent owner of the Majority Shares.[41]

---

[37] *See e.g.*, *id.* at A135–36, A141–55, A205–09 (Offering Memorandum at 4–5, 74–78, 10–24).

[38] *Id.* at A149 (Offering Memorandum at 18) ("Therefore, except for certain extraordinary matters (such as admitting new or additional general partners, changing the nature of [Danco LP's] business, acting in contravention of the Partnership Agreement, obtaining financing from affiliates of [Danco LP], or amending the Partnership Agreement), the Limited Partners have no voice in the day-to-day management of [Danco LP] or its business or affairs and have no voting rights.").

[39] *Id.*

[40] *Id.* at A180 (Offering Memorandum at 49).

[41] *Chancery Opinion*, 273 A.3d at 811 ("[Daniel's] arguments tacitly concede that there is no provision in the Irrevocable Proxy which expressly states that it runs with the Majority Shares.").

The Rescission Offer closed in 1999. It raised $23,901,966, falling short of its $27.5 million goal.[42] At trial, Mr. Hawkins estimated that he ultimately contributed $5–6 million to the Rescission Offer.

*G. Freeman Resigns*

After the Rescission Offer closed, Freemen sent a letter to Daniel and Rush dated May 17, 1999 ("Freeman Resignation Letter").[43] It informed them that he would no longer be serving as a Holder under the Irrevocable Proxy or a director of Danco GP. He explained that he was resigning in part because, "upon the completion or termination of the current financing, restructuring, [and] rescission efforts, the role of [ ] Holder is no longer necessary."[44] The Court of Chancery found that this "assertion evinces the pre-litigation understanding of a party closely involved in the settlement, and it indicates that the Irrevocable Proxy was not intended as a permanent control arrangement."[45] Freeman died in 2001, and since no one ever replaced Freeman as a Holder, Daniel and Rush are the only two remaining Holders. Rush is not a party to this litigation.

*H. The Restructuring of Old MedApproach*

After the Rescission Offer closed in 1999, Daniel caused Old MedApproach to undergo a significant restructuring. Old MedApproach dissolved and, upon its winding up, distributed its holdings across three newly formed Delaware limited partnerships: the

---

[42] App. to Opening Br. at A572 (A. Van Vranken Trial Testimony at 250).

[43] App. to Answering Br. at B362–63 (Freeman Resignation Letter).

[44] *Id.* at B362.

[45] *Chancery Opinion*, 273 A.3d at 804.

Partnership, DIG Special Assets, LP, and DIG Equity, LP. Daniel kept himself at the top of the new tri-entity structure. He is the 100% owner of his co-defendant, Holdings, the successor entity to Bio-Pharm Investments, Inc., and the general partner of the three MedApproach entities.

As part of the restructuring, Old MedApproach distributed the Majority Shares to the Partnership, which is 88% owned by Mrs. Hawkins. Because of the Majority Shares, the Partnership owns 75% of Danco GP, with Pike still holding on to the remaining 25%. Consistent with its obligations under the Addendum as a MedApproach Person, the Partnership executed an Agreement To Be Bound by Irrevocable Proxy when it became the owner of the Majority Shares on January 1, 1999.[46]

Mrs. Hawkins owns additional limited partnership interests in Danco LP through DIG Special Assets, LP and DIG Equity LP, but the two entities are otherwise not relevant to the question before the Court.

The parties agreed that the following chart accurately represents the current organizational structure of the relevant entities. Med Approach Holdings is Holdings; MedApproach LP is the Partnership; N.D. Management is Danco GP; and Danco Investors Group, L.P. is Danco LP.

[46] App. to Opening Br. at A370 (Agreement To Be Bound By Irrevocable Proxy And Power Of Attorney).




The economics of the Project flow from Danco Labs all the way up to Holdings. Danco Labs distributes all of its profits to its owner, Danco LP, which then distributes 20% of the profits to its general partner, Danco GP. Danco GP uses its 20% to pay dividends to its stockholders: The Partnership (in which Mrs. Hawkins has an 88% interest) receives 75% of any dividend and Pike receives the remaining 25%. Danco LP distributes the remaining 80% of its share of Danco Lab's profits to its limited partners. Through its

ownership of the Majority Shares and the limited partner interest in Danco LP, the Partnership receives approximately 17.71%[47] of the profits generated by Danco Labs.[48]

Holdings receives its piece of the pie as the general partner of the MedApproach entities. The Partnership pays Holdings a 1% management fee. Holdings also receives distributions on a 10% carried interest. As sole owner, Daniel receives the earnings of Holdings, net of expenses.[49]

### I. *The End of the Pike Dispute and the Beginning of the Daniel/Hawkins Dispute*

By the end of the millennium, the Project had completed the Rescission Offer, raised additional funds through the Offering, and undergone a restructuring. In September 2000, the United States Food and Drug Administration approved mifepristone for sale in the United States. Finally, by 2001, the remnants of the Pike debacle were cleared up: Disputes with Pike were resolved and the financial obligations to him under the Settlement Agreement had been satisfied.

---

[47] *See Chancery Opinion*, 273 A.3d at 805 n.17. As the owner of the Majority Shares, the Partnership receives 75% of 20% of Danco Labs' profits. 75% multiplied by 20% equals 15%. The Partnership receives 2.71% of the profits of Danco Labs through the Partnership's ownership of a limited partnership interest in Danco LP. 15% plus 2.71% equals 17.71%.

[48] *Id.* at 805.

[49] Daniel also receives considerable compensation for being a Holder. In a 1998 letter agreement, Old MedApproach acknowledged that Daniel would receive $300,000 per year from Danco LP and that Danco LP could reimburse Daniel for certain out-of-pocket expenses and additional special services he may provide. Ultimately, Daniel has earned approximately $10.3 million in proxy fees from Danco LP since 1996. He also receives $3,000 for each day spent on litigation involving the Project under an indemnification agreement with the Partnership, Danco GP, and Danco LP. Finally, Daniel earns income through an entity that leases office space to Danco GP and Danco LP.

With the threat of Pike asserting control over the Project ameliorated, Mr. Hawkins sought to terminate the Irrevocable Proxy. Daniel informed Mr. Hawkins that the Irrevocable Proxy was irrevocable and could not be relinquished. As a result, the parties have filed a series of lawsuits against one another.[50] This litigation is the latest.

*J. The Parties' Negotiations Over the Majority Shares*

The Partnership is governed by an Agreement of Limited Partnership dated as of January 1, 1999 (the "Partnership Agreement"). The Partnership Agreement provided that the Partnership shall terminate upon the expiration of its term, on December 31, 2020.

As the expiration date approached, Daniel sought the approval of the limited partners of the Partnership to extend the term of the Partnership until 2045 to align with the term of Danco LP. The limited partners agreed, except for Mrs. Hawkins. Mrs. Hawkins agreed only to extend the term until February 28, 2021. Because Mrs. Hawkins owns 88% of the limited partnership interests in the Partnership, the Partnership dissolved on that date.

The terms of the Partnership Agreement provide that after the Partnership dissolves, the only business to be conducted is completion of any pending transactions and the winding up of the affairs of the Partnership, including the distribution of its assets. The

[50] Daniel's entity, Holdings, initiated a suit in 2011 against Mr. and Mrs. Hawkins regarding management fees due to the entity. *See MedApproach Hldgs., Inc. v. Hawkins*, 2012 WL 6569268, at *1 (M.D. Tenn. Dec. 17, 2012). The parties have settled the matter. *See MedApproach Hldgs., Inc. v. Hawkins*, Civ. No. 3:11-cv-01199, ECF No. 125 (M.D. Tenn. Oct. 11, 2016). In 2021, the United States District Court for the Southern District of New York dismissed a 2013 action initiated by Mrs. Hawkins to invalidate the Irrevocable Proxy and resolve unrelated claims relating to the management of the MedApproach partnerships. *See generally Hawkins v. Daniel* (*Dismissal Decision*), 2021 WL 3732539, at *7–8 (Del. Ch. Aug. 24, 2021).

Partnership Agreement empowers its general partner, Holdings, to wind up the Partnership's affairs. In doing so, Holdings is required to convert to cash the Partnership's noncash assets and determine the capital accounts of its limited partners.

On March 22, 2021, Mr. Hawkins sent a letter to Daniel, as owner of Holdings, conveying his interest in purchasing the Majority Shares in the winding up process. In his letter, Mr. Hawkins proposed a price in the range of $12 to $15 million, under the "threshold" condition that the Majority Shares be sold "free and clear from, and not subject to," the Irrevocable Proxy.[51]

On March 25, 2021, Daniel responded that any offer would have to "take into account the terms of the [Irrevocable] Proxy."[52] The next day, Daniel solicited offers from the other limited partners in Danco LP for the Majority Shares. Only Rush responded with an offer, proposing $5 million for 80% of the Partnership's total assets based on the assumption that the Irrevocable Proxy would remain in place. The offer valued the Partnership at $6.125 million, approximately 50% lower than the bottom of the range proposed by Mr. Hawkins.

The discussions between Mr. Hawkins and Daniel regarding the Majority Shares went nowhere. Neither of them was willing to budge on the issue of the Irrevocable Proxy.

---

[51] App. to Opening Br. at A455 ("Potential Offer to Purchase N.D. Management, Inc. Stock" dated March 22, 2021).

[52] *Id.* at A457 ("MedApproach Bid" dated March 25, 2021).

*K. The Litigation*

On May 24, 2021, Mrs. Hawkins filed suit in the Court of Chancery asserting two counts against Daniel and Holdings. In Count I, Mrs. Hawkins sought a declaratory judgment that the defendants "are required to market and sell the Partnership's 75% stake in [Danco GP] free and clear from, and not subject to, the continued application of the [Irrevocable] Proxy."[53] In Count II, she sought an injunction prohibiting the defendants "from marketing and/or selling the [Majority Shares] subject to the continued application of the [Irrevocable] Proxy."[54] She also sought expedited proceedings, and the trial court granted expedition.

After dismissing a motion to dismiss filed by Daniel, the trial court held a one-day trial on September 23, 2021. At trial, Daniel agreed to postpone sale of the Majority Shares pending the outcome of this litigation. Post-trial briefing and argument moved forward on a non-expedited schedule, and the Court of Chancery issued its memorandum opinion on April 4, 2022. It entered judgment in favor of Mrs. Hawkins on May 9, 2022.

In its memorandum opinion, the Court of Chancery summarized its conclusion as follows:

> The Irrevocable Proxy does not plainly provide that it binds a subsequent owner of the Majority Shares. There is language which might be construed in that fashion if read broadly and in Daniel's favor, but that is not sufficient. The Addendum demonstrates that the parties themselves did not believe that the Irrevocable Proxy would bind a subsequent purchaser of the Majority Shares. The Addendum contains the Transfer Restriction [defined below],

[53] *Id.* at A480–81.

[54] *Id.* at A481.

> but that provision does not encompass a third party [owner] of the Majority Shares.
>
> As a result, "the language of the Proxy itself does not plainly indicate that the Proxy [is] to run with the [s]hares if they are sold." Accordingly, the Irrevocable Proxy does not run with the Majority Shares.[55]

In short, the court held that "the plain language of the Irrevocable Proxy does not establish a grant of agency authority that runs with the Majority Shares."[56] Daniel filed notice of appeal on May 31, 2022. Oral argument was held on November 2, 2022.

## *II. SCOPE AND STANDARD OF REVIEW*

Daniel claims that the Court of Chancery erred as a matter of law in interpreting the language of the Irrevocable Proxy. Because irrevocable proxies are contracts, this is a question of contract interpretation. Contract interpretation is a question of law subject to *de novo* review by this Court.[57] "Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning."[58] To the extent Daniel challenges the factual findings of the trial court, we will not disturb those findings "unless they are clearly erroneous and not supported by the record."[59] "Where there are two

---

[55] *Chancery Opinion*, 273 A.3d at 832–33 (quoting *TR Invs., LLC v. Genger*, 2010 WL 2901704 (*Genger Trial*), at *20 (Del. Ch. July 23, 2010), *aff'd*, 26 A.3d 180 (Del. 2011)).

[56] *Id.* at 812.

[57] *See, e.g.*, *Genger v. TR Invs., LLC*, 26 A.3d 180, 190 (*Genger*) (Del. 2011) (interpreting proxy); *Stream TV Networks, Inc. v. Seecubic, Inc.* (*Stream TV*), 279 A.3d 323, 336 (Del. 2022) (interpreting corporate charter).

[58] *Stream TV*, 279 A.3d at 336 (quoting *Alta Berkeley VI C.V. v. Omneon Inc.*, 41 A.3d 381, 385 (Del. 2012)).

[59] *Genger*, 26 A.3d at 190 (citing *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010)).

permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."[60]

## *III. ANALYSIS*

This Court must determine whether the Court of Chancery erred in finding that the Irrevocable Proxy does not run with the Majority Shares. Delaware public policy and law require that the terms of an irrevocable proxy be clear and unambiguous.[61] Therefore, a Delaware court will not look to extrinsic evidence in interpreting an irrevocable proxy but will rely on the four corners of the proxy instrument itself. Where the irrevocable proxy is ambiguous, the ambiguity will be construed against the rights of the proxy holder.[62]

As explained more fully below, we agree with the Court of Chancery, at least to the extent that the Irrevocable Proxy is ambiguous as to whether it binds subsequent third-party owners of the Majority Shares. As a result, it should be construed against the rights of the Holder, Daniel. That means the Irrevocable Proxy does not run with the Majority Shares in a sale to an unaffiliated third party.

---

[60] *Bank of New York Mellon Trust Co., N.A. v. Liberty Media Corp.*, 29 A.3d 225, 236 (Del. 2011).

[61] *Genger Trial*, 2010 WL 2901704 at *20 (finding that a proxy did not run with the shares because "the language of the Proxy itself does not plainly indicate that the Proxy was to run with the Shares if they are sold" and that "[e]ven if the language of the Proxy was ambiguous–which it is not–public policy concerns require that the Proxy be strictly construed").

[62] *Id. See also Eliason v. Englehart*, 733 A.2d 944, 947 (Del. 1999) (finding a proxy to be revocable where the words expressly stating that it was an "Irrevocable Proxy" were only found in the instrument's signature acknowledgement, not in the language of the proxy itself).

### A. *Irrevocable Proxies Are Strictly Construed*

In the opinion below, the Court of Chancery recognized that "under the Delaware model, stockholders are presumed to vote in their economic interest."[63] When stockholders vote in their economic interests, the collective vote of the stockholders "serve[s] the 'community of interest' among all shareholders" and furthers the corporate goal of wealth maximization.[64] This presumption underlies our Delaware courts' preference to defer to the vote of disinterested stockholders. "[T]he long-standing policy of our law has been to avoid the uncertainties and costs of judicial second-guessing when the disinterested stockholders have had the free and informed chance to decide on the economic merits of a transaction for themselves."[65]

---

[63] *Chancery Opinion*, 273 A.3d at 808. *See, e.g., Crown EMAK Partners LLC v. Kurz*, 992 A.2d 377, 389 (Del. 2010) (affirming the Court of Chancery's conclusion that no improper vote buying occurred since the economic and voting interests remained aligned when both sets of interests were transferred by the purchase agreement); *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1380–81 (Del. 1995) (noting that "stockholders are presumed to act in their own best economic interests when they vote in a proxy contest").

[64] *Crown EMAK Partners LLC*, 992 A.2d at 388 (citing *In re IXC Commc'ns, Inc. S'holders Litig.*, 1999 WL 1009174, at *8 (Del. Ch. Oct. 27, 1999)); *see also Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304, 314 (Del. 2015) ("In circumstances, therefore, where the stockholders have had the voluntary choice to accept or reject a transaction, the business judgment rule standard of review is the presumptively correct one and best facilitates wealth creation through the corporate form."); *Haft v. Haft*, 671 A.2d 413, 421 (Del. Ch. 1995) ("A powerful argument can be advanced that generally the congruence of the right to vote and the residual rights of ownership will tend towards efficient wealth production.").

[65] *Corwin*, 125 A.3d at 312–13; *see also In re Lear Corp. S'holder Litig.*, 926 A.2d 94, 114–15 (Del. Ch. 2007) ("Delaware corporation law gives great weight to informed decisions made by an uncoerced electorate. When disinterested stockholders make a mature decision about their economic self-interest, judicial second-guessing is almost completely circumscribed by the doctrine of ratification.") (internal footnotes omitted)). This Court in *Corwin* explained the underlying rationale of our policy not to second-guess the informed choice of disinterested stockholders:

The legitimizing influence of a stockholder vote is premised upon the alignment of the economic and voting interests of stockholders. However, innovations in technology and finance have made it easier to separate the voting interests from the financial interests of shares.[66] Early Delaware courts were suspicious of such arrangements.[67] In *Schreiber v. Carney*,[68] for example, our Court of Chancery examined the state of the law as it related

---

> When the real parties in interest—the disinterested *equity owners*—can easily protect themselves at the ballot box by simply voting no, the utility of a litigation-intrusive standard of review promises more costs to stockholders in the form of litigation rents and inhibitions on risk-taking than it promises in terms of benefits to them. The reason for that is tied to the core rationale of the business judgment rule, which is that judges are poorly positioned to evaluate the wisdom of business decisions and there is little utility to having them second-guess the determination of impartial decision-makers with more information (in the case of directors) *or an actual economic stake in the outcome (in the case of informed, disinterested stockholders)*."

*Corwin*, 125 A.3d at 313–14 (emphasis added) (internal footnote omitted).

[66] *Crown EMAK Partners LLC*, 992 A.2d at 387–88 (citing Robert B. Thompson & Paul H. Edelman, *Corporate Voting*, 62 Vand. L. Rev. 129, 153 (2009)). Innovations have also led to the rise in dual-, multi-, and zero-class voting structures, as opposed to the "one share-one vote" default rule memorialized in our 8 *Del. C.* § 212(a). *See* David T. White, *Delaware's Role in Handling the Rise of Dual-, Multi-, and Zero-Class Voting Structures*, 45 Del. J. Corp. L. 141 (2020); Thompson & Edelman, *supra*, at 158–60.

[67] *See e.g.*, *Oceanic Exploration Co. v. Grynberg*, 428 A.2d 1, 7 (Del. 1981) (observing that "[v]oting trusts were viewed with 'disfavor' or 'looked upon . . . with indulgence' by the courts" and "other contractual arrangements interfering with stock ownership, such as irrevocable proxies, were viewed with suspicion'") (citing *Perry v. Missouri-Kansas Pipe Line Co.*, 191 A. 823, 827 (Del. Ch. 1937))); *Haft*, 671 A.2d at 421 ("[I]t is appropriate to acknowledge that the corporate law has tended to distrust and discourage the separation of the shareholder claim as equity investor (*i.e.*, the right to enjoy distributions on stock if, as, and when declared) from the right to vote stock. For example there was for many years a rather clear rule against the sale of a corporate vote unattached to the sale of the underlying stock.") (internal footnote omitted) (evaluating whether a proxy was irrevocable); *Commonwealth Assocs. v. Providence Health Care, Inc*, 641 A.2d 155, 157 (Del. Ch. 1993) ("The law has long discouraged the sale of votes unconnected to the sale of stock."); *Macht v. Merchants Mortgage & Credit Co.*, 194 A. 19, 22 (Del. Ch. 1937) ("To allow voting rights that are bought to be exercised is against public policy, and would be in fraud of the other stockholders.").

[68] 447 A.2d 17 (Del. Ch. 1982).

to vote-buying.[69] It clarified that "an agreement involving the transfer of stock voting rights without the transfer of ownership is not necessarily illegal and each arrangement must be examined in light of its object or purpose."[70]

Nearly three decades later, this Court, in *Crown EMAK Partners LLC*, again examined a challenged vote-buying arrangement. We recognized that the separation of voting power and economic interest should be subject to greater scrutiny because it "compromises the ability of voting to perform its assigned role."[71] We affirmed the Court of Chancery's conclusion that no improper vote buying had occurred in that case "because the economic interests and the voting interests of the shares remained aligned."[72] We explained:

> For many years, Delaware decisions have expressed consistent concerns about transactions that create a misalignment between the voting interest and the economic interest of shares. As then Vice–Chancellor (now Chief Justice)

[69] The *Schreiber* court defined vote-buying as "a voting agreement supported by consideration personal to the stockholder, whereby the stockholder divorces his discretionary voting power and votes as directed by the offeror." *Id.* at 23.

[70] *Id.* at 25.

[71] *Crown EMAK Partners LLC*, 992 A.2d at 388 (citing Thompson & Edelman, *supra* note 66, at 153). The *Crown EMAK* Court further quoted Thompson and Edelman: "They concluded that '[a] decisionmaking system that relies on votes to determine the decision of the group necessarily requires that the voters' interest be aligned with the collective interest. [Therefore, i]t remains important to require an alignment between share voting and the financial interest of the shares." *Id*. (alteration in original); *see also Commonwealth Assocs.*, 641 A.2d at 157 (noting law's historic concern about "the sale of votes unconnected to the sale of stock" in part because "such sales misalign the interests of voters and the interests of the residual corporate risk bearers"). Accordingly, Delaware law requires that an irrevocable proxy be "coupled with an interest" whether "in the stock itself" or "in the corporation generally." 8 *Del. C.* § 212(e) ("A duly executed proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power. A proxy may be made irrevocable regardless of whether the interest with which it is coupled is an interest in the stock itself or an interest in the corporation generally.").

[72] *Crown EMAK Partners LLC*, 992 A.2d at 390.

> Steele explained, "[g]enerally speaking, courts closely scrutinize vote-buying because a shareholder who divorces property interest from voting interest [ ] fails to serve the 'community of interest' among all shareholders, since the 'bought' shareholder votes may not reflect rational, economic self-interest arguably common to all shareholders." Again, in this case, the Court of Chancery recognized that "[w]hat legitimizes the stockholder vote as a decision-making mechanism is the premise that stockholders with economic ownership are expressing their collective view as to whether a particular course of action serves the corporate goal of stockholder wealth maximization."[73]

A proxy instrument is evidence of an agency relationship wherein the beneficial owner-principal appoints a proxy holder-agent as attorney-in-fact with respect to the voting rights of the shares.[74] Thus, by its very nature, a proxy, which temporarily splits the power to vote from the residual ownership claim of the stockholder, has the potential to create misalignment between the voting interest and the economic interest of shares. As the Court of Chancery noted, the risks of significant divergence of interests between the proxy holder and the holder of the residual interests are enhanced where the proxy is irrevocable. That is because an irrevocable proxy, unlike a revocable proxy which is typically of relatively short duration and is revocable by the grantor, frees the holder from "the unilateral control of the grantor."[75] Here, not only is the proxy arrangement irrevocable, but Daniel asks this

---

[73] *Crown EMAK Partners LLC*, 992 A.2d. at 388 (first quoting *In re IXC Commc's, Inc. S'holders Litig.*, 1999 WL 1009174, at *8; then quoting *Kurz v. Holbrook*, 989 A.2d 140, 178 (Del. Ch. 2010)).

[74] *See Eliason*, 733 A.2d at 946 ("A proxy is evidence of an agent's authority to vote shares owned by another.") (citing *Duffy v. Loft, Inc.*, 151 A. 223, 227 (Del. Ch.), *aff'd*, 152 A. 849 (Del. 1930))); *Moran v. Household Int'l, Inc.*, 500 A.2d 1346, 1355 (Del. 1985) ("[I]t has long been recognized that the relationship between grantor and recipient of a proxy is one of agency, and the agency is revocable by the grantor at any time.").

[75] *Haft*, 671 A.2d at 421.

Court to find that it runs with the Majority Shares, binding a future owner to an agent that may or may not be economically aligned.

As our approach to vote-buying arrangements and voting trusts has liberalized with innovations in technology and finance, so, too, has our approach to proxy arrangements.[76] Still, because of the concerns arising from a decoupling of the voting and economic interest in shares, "[h]istorically, proxies have been interpreted narrowly and when there is an ambiguity, read as not restricting the right to vote the shares."[77] When interpreting an irrevocable proxy, Delaware courts do not turn to extrinsic evidence to resolve an ambiguity. Rather, they construe the irrevocable proxy in favor of the rights of the

---

[76] *See Oceanic Exploration Co. v. Grynberg*, 428 A.2d 1, 7 (Del. 1981). In finding that the trial court erred in holding that a contract among stockholders was a "voting trust" within the meaning of 8 *Del. C.* § 218(a) and (b), we observed:

> [I]t is important to recognize there has been a significant change from the days of our original 1925 statute. Voting trusts were viewed with "disfavor" or "looked upon . . . with indulgence" by the courts. Other contractual arrangements interfering with stock ownership, such as irrevocable proxies, were viewed with suspicion. The desire for flexibility in modern society has altered such restrictive thinking. The trend of liberalization was markedly apparent in the 1967 changes to our own [8 Del. C. § 218]. Voting or other agreements and irrevocable proxies were given favorable treatment and restrictive judicial interpretations as to the absolute voiding of voting trusts for terms beyond the statutory limit were changed by statute.

*Id.* (alteration in original) (citing E. FOLK, *The Delaware General Corporation Law* § 218 at 240–42 (1972)).

Further, in 1967, the General Assembly amended 8 *Del. C.* § 212(c) (now § 212(e)) to clarify that a proxy may be made irrevocable "regardless of whether the interest with which it is coupled is an interest in the stock itself or an interest in the corporation generally." 8 *Del. C.* § 212(e). The language added in 1967 ("an interest in the corporation generally") was intended to address a suggestion in *In re Chilson*, 168 A. 82 (Del. Ch. 1933) that in order to support irrevocability, the holder had to have an interest in the stock itself.

[77] *Genger Trial*, 2010 WL 2901704, at *20.

beneficial owner of the shares.[78] Here, the Irrevocable Proxy does not run with the Majority Shares unless its plain language clearly and unambiguously provides that it does.[79] The Court of Chancery read the Irrevocable Proxy as a whole, painstakingly examining the preamble, recitals, each operative provision, and the Addendum, and concluded that it does not. For the reasons discussed below, we agree.

### *B. The Plain Language of the Irrevocable Proxy*

On appeal, Daniel contends that the plain language of the Irrevocable Proxy provides that it runs with the Majority Shares and that the Court of Chancery erred in three ways in concluding otherwise. Daniel's first two arguments concern the provision regarding non-termination of the Irrevocable Proxy (the "Non-Termination Provision"). His final argument concerns the provision governing assignment of rights under the Irrevocable Proxy (the "Assignment Provision"). Daniel does not challenge other of the Court of Chancery's findings supporting its opinion.[80]

---

[78] *See id.* (finding that because "language of the Proxy itself does not plainly indicate that the Proxy was to run with the Shares if they are sold," they did not and that "[e]ven if the language of the Proxy was ambiguous . . . public policy concerns require that the Proxy be strictly construed").

[79] *See generally Urdan v. WR Cap. Partners, LLC*, 2019 WL 3891720, at *11 (Del. Ch. Aug. 19, 2019) ("If a seller wishes to retain a subset of the rights associated with the transferred shares, such as the right to assert a direct claim, then the parties to the transaction must provide specifically for that outcome."), *aff'd*, 244 A.3d 668 (Del. 2020); *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1050 (Del. Ch. 2015) ("When a share of stock is sold, the property rights associated with the shares, including any claim for breach of those rights and the ability to benefit from any recovery or other remedy, travel with the shares.").

[80] The Irrevocable Proxy provides that its terms shall be governed by the law of the State of California "[e]xcept to the extent required by the corporate or other provisions of the laws of the Cayman Islands." App. to Opening Br. at A035 (Irrevocable Proxy at 2, ¶ 3). Despite the Irrevocable Proxy's choice of law provision, the parties have relied almost entirely on Delaware law in litigating this case. We, like the Court of Chancery, follow the parties' lead and interpret the Irrevocable Proxy according to Delaware law. *Chancery Opinion*, 273 A.3d at 810 n.21.

We first address several findings of the Court of Chancery which Daniel does not challenge on appeal, but which support our conclusion that the Irrevocable Proxy does not run with the Majority Shares. We then address each of Daniel's arguments in turn.

1. *The Court of Chancery's Unchallenged Findings*

The Court of Chancery began its analysis of the Irrevocable Proxy with an overview of its plain language. It found that (1) the definitions of "Stockholder" and "Shares" in the preamble, (2) the plain language of the Appointment Provision (defined below), and (3) the presence of the Addendum, all weighed in favor of Appellee's reading of the Irrevocable Proxy.[81] Daniel does not challenge these findings on appeal. The force of these unchallenged findings undermines Daniel's arguments that the Court of Chancery erred in finding that the Irrevocable Proxy runs with the Majority Shares.

a. *The Definitions of "Stockholder" and "Shares" Limit the Irrevocable Proxy to Only Those Shares Owned By Pike, Then By Old MedApproach, and Now By the Partnership*

The Irrevocable Proxy is the instrument by which the owner of the Majority Shares granted the Holders the authority to exercise the Majority Shares' attendant voting rights. The preamble of the Irrevocable Proxy defines the "Stockholder" as "Joseph D. Pike."[82] It does not include language that would include subsequent holders of the Majority Shares. The Addendum provides that, at any time that Old MedApproach or a MedApproach

[81] The trial court's opinion discusses additional recitals which it analyzed in the context of Daniel's suggestion that the Irrevocable Proxy was intended to be a permanent corporate governance arrangement. *See supra* note 29.

[82] App. to Opening Br. at A034 (Irrevocable Proxy at 1).

Person holds the Proxy Shares, all references to "Stockholder" in the Irrevocable Proxy shall refer to the MedApproach stockholder.[83] Therefore, every reference to "Stockholder" in the Irrevocable Proxy is only to Pike initially, then Old MedApproach, and now, to the Partnership.[84]

The first recital in the Irrevocable Proxy defines the "Shares" as "an aggregate of 100 shares [ ] of the Common Stock, $1.00 par value, of [Danco GP]" of which "the Stockholder is the sole beneficial owner."[85] In other words, they are the "Shares" that were owned by Pike at the time he executed the Irrevocable Proxy.[86] Now they are the "Shares" owned by the Partnership.

The narrow definitions of "Stockholder" and "Shares," carried through the Addendum and the Agreement To Be Bound, do not evince an intent by the parties for the Irrevocable Proxy to run with the Majority Shares. Instead, the two definitions cabin the applicability of the Irrevocable Proxy to those shares owned by Old MedApproach or any other MedApproach Person who has agreed to be bound by the Irrevocable Proxy and has become a "Stockholder." In short, as the Court of Chancery found, "there is nothing in the

---

[83] *Id.* at A039 (Irrevocable Proxy at 5).

[84] *See id.* at A370 (Agreement To Be Bound By Irrevocable Proxy And Power Of Attorney) ("[The Partnership] hereby joins, becomes a party to, and agrees to be bound as a 'Stockholder' by the provisions, terms and conditions of, and shall be entitled to all rights, benefits and remedies as a 'Stockholder' under [the Irrevocable Proxy] . . . .").

[85] *Id.* at A034 (Irrevocable Proxy at 1).

[86] *Chancery Opinion*, 273 A.3d at 813.

preamble or recitals standing alone that would suggest the Irrevocable Proxy runs with the Majority Shares."[87]

*b. The Appointment Provision Indicates the Holders Are Only Appointed as to the Shares Pike Owned During the Term of the Irrevocable Proxy*

The first operative provision of the Irrevocable Proxy is the provision that grants Daniel, Freeman, and Rush the power to exercise the Proxy Shares' voting rights (the "Appointment Provision").[88] The Appointment Provision states in relevant part:

> The Stockholder hereby constitutes and appoints each Holder, during the term of this Irrevocable Proxy, as the Stockholder's true and lawful proxy and attorney-in-fact, with full power of substitution, to vote all of the Shares plus any additional Shares which Stockholder may own or hold as of the date of any such vote (and any all [sic] securities issued or issuable in respect thereof) which Stockholder is entitled to vote (collectively, the "Proxy Shares"), for and in the name, place and stead of the Stockholder, at any annual, special or other meeting of the stockholders of the Company, and at any adjournment or postponement thereof, or pursuant to any consent in lieu of a meeting or otherwise.[89]

This Court examined a similar appointment provision in *Genger*,[90] where it upheld the Court of Chancery's finding that the proxy there did not run with the associated shares. The appointment provision of the proxy in *Genger* provided that:

> The [Sagi Trust] . . . does hereby constitute and appoint Arie Genger . . . to vote as its proxy, all shares of common stock of [Trans–Resources] *which*

---

[87] *Id.* at 814.

[88] The Appointment Provision creates the agency relationship under Delaware law. It both appoints someone — the Holders — to vote the shares, *see Loboto v. Health Concepts IV, Inc.*, 606 A.2d 1343, 1347 (Del. Ch. 1991), and "identif[ies] the shares to be voted by the agent," *Eliason*, 733 A.2d at 946.

[89] App. to Opening Br. at A034 (Irrevocable Proxy at 1, ¶ 1).

[90] 26 A.3d 180.

> *are now or hereafter owned by the Trust,* at any and all meetings of the stockholders of Trans–Resources . . . .[91]

This Court looked at the proxy's plain language and agreed that the proxy "would attach only to those [Trans–Resources] shares that were 'now or hereafter *owned by the Trust*.'"[92] Because there was no provision explicitly providing that shares owned by a subsequent owner would be covered by the proxy and the proxy plainly only applied to those shares "owned by the Trust," the proxy did not run with the shares at issue.[93]

Here, the Appointment Provision states that *Pike*, as the Stockholder, appointed the Holders to be his proxy and attorney-in-fact "to vote all of the Shares plus any additional Shares *which Stockholder may own or hold as of the date of any such vote* (and any all [sic] securities issued or issuable in respect thereof) *which Stockholder is entitled to vote*." The Appointment Provision here goes one step further than that in *Genger,* clarifying that the Holders may vote the shares "for and in the name, place and stead *of the Stockholder*." As in *Genger,* by its plain language, the appointment is only with respect to shares of Danco GP owned by "the Stockholder" at the time of a vote and the authority only extends as far as that of the Stockholder. As discussed above, because "Stockholder" is defined only as Pike, and later Old MedApproach and the Partnership, the provision indicates that the Irrevocable Proxy does not run with the Majority Shares.

---

[91] *Id.* at 198 (alteration in original) (emphasis in original).

[92] *Id.*

[93] *Id.* ("The Proxy contains no provision that would bind any *subsequent* owner of those shares. Once sold or transferred to a subsequent owner, those shares were no longer 'owned by the [Sagi] Trust' and therefore, were no longer subject to the Proxy.") (emphasis in original).

*c. The Addendum Demonstrates That the Drafters Did Not Intend Subsequent Buyers to Be Bound by The Irrevocable Proxy Absent Their Agreement to Be Bound*

As discussed above, the initial Settlement Agreement contemplated that certain Participating Investors, defined as Old MedApproach, Freeman, Rush, and importantly, any other limited partner of Danco LP who wanted to sign onto the Settlement Agreement, would fund the Pike Loan to purchase the Majority Shares from Pike. Days later, the LP Representatives determined that offering the opportunity to all limited partners of Danco LP was impracticable and threatened to delay the deal, so the parties agreed instead that Old MedApproach alone would purchase the Majority Shares. As a result, Old MedApproach executed the Addendum, agreeing to be bound to the Irrevocable Proxy once it received the Majority Shares from Pike.[94]

Daniel testified that the Addendum was prepared primarily by Popco's attorney and executed at its request.[95] The Addendum, described by the Court of Chancery as a "drafting monstrosity" and "not a model of clarity,"[96] consists entirely of the following paragraph:

> At any time that [Old MedApproach], or its affiliates, owners, designees or nominees (or their respective successors or assigns) (each a "MedApproach Person") is a beneficial or record holder of any of the Shares or any of the Proxy Shares, [Old MedApproach] hereby agrees (and agrees to cause each other MedApproach Person to agree) that references in this Irrevocable Proxy to "Stockholder" shall mean and include [Old MedApproach] (or such MedApproach Person) with references to "the date hereof" in Section 2(a) being instead a reference to the date of closing under the Agreement), and

[94] *Chancery Opinion*, 273 A.3d at 829.

[95] *See id.* at 829; App. to Opening Br. at A546 (W. B. Daniel Trial Testimony at 146–47). The trial court found that Popco's attorney "did not believe that the language of the Irrevocable Proxy, standing alone, was sufficient to bind Old MedApproach to the Irrevocable Proxy." *Chancery Opinion*, 273 A.3d at 829.

[96] *Chancery Opinion*, 273 A.3d at 830.

> that [Old MedApproach] is bound (and [Old MedApproach] agrees not to transfer any such shares to any other MedApproach Person unless such transferee agrees in writing satisfactory to the [ ] Holders (other than W. Bradley Daniel) to be bound) by this Irrevocable Proxy as the Stockholder; provided, however, no MedApproach Person shall be deemed the Stockholder for purposes of Section 2 hereof. [Old MedApproach] agrees to duly authorize, execute and deliver a restated Irrevocable Proxy reflecting the foregoing promptly after the closing under the Agreement and such other agreements or documents as are reasonably necessary or appropriate to carry out the intent of the foregoing.[97]

The existence of the Addendum suggests that the parties to the Irrevocable Proxy, and Popco, understood at the time of its execution that the Irrevocable Proxy would not run with the Majority Shares. If the terms of the Irrevocable Proxy provided it would run with the Majority Shares, then there would be no need to execute an Addendum to bind Old MedApproach. In short, the court found that "the parties entered into the Addendum to ensure that the Irrevocable Proxy would bind the one subsequent owner that they knew about — Old MedApproach."[98]

The Addendum not only provides that Old MedApproach will become a "Stockholder" for purposes of the Irrevocable Proxy, but also, it contains a transfer restriction at the end of the first sentence (the "Transfer Restriction"). The Court of Chancery found that the Transfer Restriction (1) "applies to any transfer by one MedApproach Person to another MedApproach Person," and (2) that "a MedApproach Person only means an entity or individual affiliated with Old MedApproach, not a third

[97] App. to Opening Br. at A039–40 (Irrevocable Proxy at 5–6).

[98] *Chancery Opinion*, 273 A.3d at 814.

party."[99] Accordingly, the Transfer Restriction obligates Old MedApproach to ensure that in any transfer to an affiliated entity, the affiliated entity agrees to be bound by the Irrevocable Proxy. Further, the Addendum does not restrict a transfer to an unaffiliated third party.[100]

The Transfer Restriction demonstrates that the parties to the Irrevocable Proxy did not believe that it ran with the Majority Shares upon their sale. If it did run with the Majority Shares, then there would be no need for the Transfer Restriction, let alone the Addendum. Any buyer of the Majority Shares would already be bound by the Irrevocable Proxy by its terms and there would be no need for the MedApproach Person-seller to enforce the proxy against any MedApproach Person-buyer. The Transfer Restriction also demonstrates that the parties knew how to restrict a transfer of the Majority Shares but only elected to apply that restriction to a narrow set of transfers.[101]

These three aspects of the Irrevocable Proxy — the definitions of Stockholder and Shares, the language in the Appointment Provision, and the presence of the Addendum and Transfer Restriction — all indicate that the parties did not intend the Irrevocable Proxy to run with the Majority Shares. In the face of these findings, along with the need to show in clear and unambiguous language that the Irrevocable Proxy runs with the Majority Shares, Daniel faces an uphill battle in demonstrating that the Court of Chancery erred. To win

[99] *Id.* at 832.

[100] *Id.* The trial court's unchallenged interpretation of the Transfer Restriction reinforces that the Addendum does not restrict a transfer to an unaffiliated third party (i.e., persons other than a MedApproach Person).

[101] *Id.*

the battle, he must show that the remaining provisions of the Irrevocable Proxy unambiguously overcome the foregoing plain language. As explained below, Daniel fails in his challenge.

*2. The Non-Termination Provision*

Daniel's first two arguments on appeal concern the Non-Termination Provision in the Irrevocable Proxy. He argues that the Non-Termination Provision "memorialized the parties' intent for the proxy to survive a sale of the shares and bind subsequent owners."[102] The Non-Termination Provision, found in paragraph five of the Irrevocable Proxy, reads in its entirety, as follows:

> The Stockholder agrees that such Irrevocable Proxy is coupled with an interest sufficient in law to support an irrevocable power and shall not be terminated *by any act of the Stockholder* (other than in connection with the termination provisions of Section 4 hereof), by death or disability of the Stockholder, by lack of appropriate power or authority *or by the occurrence of any other event or events* other than as provided in Section 4 hereof.[103]

Daniel argues that the words "*by any act of the Stockholder*" and "*or by the occurrence of any other event or events*" include the sale of the Majority Shares by the Stockholder. Therefore, a sale of the Majority Shares by the Stockholder would not terminate the Irrevocable Proxy. Under Daniel's reading, the provision "communicates that only the circumstances of Section 4 may result in termination of the Irrevocable Proxy."[104]

---

[102] Opening Br. at 21.

[103] App. to Opening Br. at A035 (Irrevocable Proxy at 2, ¶ 5) (emphasis added).

[104] Opening Br. at 21. The Court of Chancery referred to Section 4 as the "Termination Provision." The Termination Provision provides that:

> This Irrevocable Proxy shall terminate immediately upon the occurrence of any of the following: (i) the merger or other reorganization of [Danco GP] in connection

The Court of Chancery rejected Daniel's reading of the Non-Termination Provision. It found that "the more natural reading is that the Non-Termination Provision confirms that the Stockholder cannot terminate the Irrevocable Proxy while owning the Majority Shares" but "does not say anything about whether the Irrevocable Proxy binds a subsequent owner."[105]

On appeal, Daniel argues that the Court of Chancery erred with respect to the Non-Termination Provision in two ways: (1) *first*, it erroneously read the provision, primarily the language "by any act of the Stockholder," against default principles in the Restatement (Third) of Agency, which themselves are contrary to Delaware law,[106] and (2) *second*, it effectively read additional language into the provision to conclude that the broad catch-all language "any other event or events" did not include a sale of the Majority Shares.[107] We address each argument in turn.

*a. The Court of Chancery's Reference to Default Principles of Common Law Was Not Essential to its Holding*

Daniel argues that the phrase "any act of the Stockholder" in the Non-Termination Provision includes the sale of the Majority Shares by the Stockholder. The Court of

with the formation of "Newco" as contemplated in the [Settlement Agreement], but only if and to the extent the terms and conditions of the documentation pursuant to which such merger or other reorganization is effected expressly refer to this Irrevocable Proxy and expressly provide that this Irrevocable Proxy shall terminate pursuant to such documents; or (ii) upon notice of termination given by the Holders to the Stockholder. App. to Opening Br. at A035 (Irrevocable Proxy at 2, ¶ 4).

[105] *Chancery Opinion*, 273 A.3d at 819.

[106] Opening Br. at 22–23.

[107] *Id.* at 28.

Chancery concluded that Daniel's reading was "one possible reading" but "[t]he better reading is that the concept of an 'act of the Stockholder' encompasses acts that the principal might take to terminate the agency relationship while remaining the owner of the Majority Shares."[108]

Explaining why its reading was the better one, the Court of Chancery determined that the Non-Termination Provision tracks the following categories in Section 3.13 of the Restatement (Third) of Agency wherein, "[u]nless otherwise agreed, neither a power given as security nor a proxy made irrevocable" will be terminated by:

> (a) a manifestation revoking the power or proxy made by the person who created it; or
>
> . . .
>
> (c) loss of capacity by the creator or the holder of the power or proxy; or
>
> . . .
>
> (e) death of the creator of the power or proxy, if the power or proxy is given as security for the performance of a duty that does not terminate with the death of its creator.[109]

According to the Court of Chancery, the language "by any act of the Stockholder" reflects the common law principle stated in clause (a) of the Restatement that "a manifestation revoking the power or proxy made by the person who created it" will not terminate an irrevocable proxy "[u]nless otherwise agreed."[110] Thus, it found that the Non-Termination

[108] *Chancery Opinion*, 273 A.3d at 820.

[109] RESTATEMENT (THIRD) OF AGENCY § 3.13(2) (Am. Law. Inst. 2006), *available at* Westlaw (database updated Oct. 2022).

[110] *Chancery Opinion*, 273 A.3d at 819, 820. Daniel similarly argued that the phrase "death or disability of the Stockholder" in the Irrevocable Proxy should be read to include the dissolution and winding up of the Partnership. The Court of Chancery rejected Daniel's "death or disability" argument, concluding that "death or disability" is materially different than dissolution and that the phrase, instead, mirrored the common law principles stated in clause (c) and (e) of the Restatement.

Provision, "is not a bespoke provision designed to make the Irrevocable Proxy run with the Majority Shares."[111]

Moreover, it determined that Daniel's reading of the phrase "any act of the Stockholder" conflicts with the common law principles in the Restatement.[112] In Section 3.13(1), the Restatement (Third) provides:

> A power given as security or an irrevocable proxy is terminated by an event that
>
> > (a) discharges the obligation secured by the power or terminates the interest secured or supported by the proxy, or
> >
> > (b) makes its execution illegal or impossible, or
> >
> > (c) constitutes an effective surrender of the power or proxy by the person for whose benefit it was created or conferred.[113]

Comment b to Section 3.13 explains that, under the above circumstances "irrevocable proxies will always terminate."[114]

Accordingly, the Court of Chancery concluded that, absent express language to the contrary, a sale of shares that is the subject of an irrevocable proxy terminates the irrevocable proxy under the principle stated in clause (b). This is because:

---

*Id.* at 821–22 ("There are multiple difficulties with Daniel's reading. First, death is not the same as dissolution . . . Second, the reference to 'death or disability' tracks the common law concepts framed in Sections 3.13(2)(c) and (e) of the Restatement . . . The clear distinction between the consequences of death or disability and the consequences of a sale mean that the reference to 'death or disability' in the Irrevocable Proxy does not cause the Irrevocable Proxy to run with the Majority Shares."). Daniel does not challenge this finding on appeal.

[111] *Id.* at 819–20.

[112] *Id.* at 820.

[113] RESTATEMENT (THIRD) OF AGENCY § 3.13(1).

[114] *Id.* at § 3.13 cmt. b.

> After a sale, the grantor no longer has the right to vote the shares that are the subject of the proxy. Instead, the right belongs to the subsequent owner. The proxyholder cannot exercise the grantor's right to vote because the grantor no longer possesses that right. Consequently, absent specific and express language to the contrary, an irrevocable proxy terminates "when it is no longer possible for the proxyholder to vote because the grantor of the proxy no longer owns the securities or membership interest."[115]

The Court of Chancery added that "[o]nly if the purchaser both knows about an irrevocable proxy *and* the irrevocable proxy contains plain and unambiguous language binding a subsequent owner will the purchaser acquire the shares subject to the irrevocable proxy."[116]

Daniel articulates three reasons why the Court of Chancery's reliance on the Restatement (Third) of Agency constitutes legal error. Although we address Daniel's arguments for completeness, we conclude that the Court of Chancery's discussion of the Restatement was not essential to its ultimate holding, and regardless of the merits (or lack thereof) of his contentions about the Restatement, Daniel still fails to show that the Irrevocable Proxy clearly and unambiguously provides that it runs with the Majority Shares.

*i. Daniel's Reliance on Stream TV is Misplaced*

*First*, Daniel argues that the trial court's finding that the Irrevocable Proxy "tracked" three of the five termination events listed in the Restatement was erroneous, and therefore,

---

[115] *Chancery Opinion*, 273 A.3d at 820 (quoting RESTATEMENT (THIRD) OF AGENCY § 3.13 cmt. b).

[116] *Id.* (emphasis in original).

under this Court's decision in *Stream TV*,[117] it was improper for the trial court to rely on the Restatement (Third) to interpret the contractual language.[118]

Daniel's' reliance on *Stream TV* is misplaced. The question before this Court in *Stream TV* was whether the approval of the Class B stockholders of Stream TV Networks, Inc. ("Stream Inc."), was required before Stream Inc. could enter into an agreement to transfer and assign all rights, title and interest in all of the company's assets for the benefit of certain of its creditors (the "Stream Omnibus Agreement").[119] Stream Inc.'s charter provided that a majority vote of the Class B stockholders was required for the company to undertake certain corporate actions, including an "Asset Transfer." The charter defined "Asset Transfer" as a "sale, lease *or other disposition* of all or substantially all of the assets or intellectual property" of Stream Inc., and the granting of certain intellectual property licenses of Stream Inc.[120] This Court found that the plain meaning of "other disposition" included the transfer and assignment of all rights, title and interest in all of the company's assets for the benefit of its creditors.[121] Therefore, the Stream Omnibus Agreement needed to be approved by the majority of Stream Inc.'s Class B stockholders.

In so holding, this Court reversed the Court of Chancery's determination that Stream Inc.'s board of directors unilaterally could cause Stream Inc. to enter into the Stream

---

[117] 279 A.3d 323.

[118] Opening Br. at 23–24.

[119] *Stream TV*, 279 A.3d at 340.

[120] *Id.* at 338 (emphasis added).

[121] *Id.* at 340.

Omnibus Agreement. The Court of Chancery had found that although the Stream Omnibus Agreement contemplated an "Asset Transfer," the charter provision "tracked" Section 271 of the Delaware General Corporation Law and thus "warrant[ed] the same interpretation."[122] Rather than looking to the plain language of Stream Inc.'s charter, the Court of Chancery looked to Section 271 as an interpretive guide. It found that at the time of the enactment of Section 271's predecessor statute, there was a common law insolvency exception in Delaware which allowed an insolvent company's board of directors to unilaterally sell the assets of the company for the benefit of its creditors. In effect, the Court of Chancery overrode the plain language of Stream Inc.'s charter in favor of a common law exception it concluded existed in Delaware and was not superseded by Section 271. We also clarified in our *Stream TV* opinion that the insolvency exception identified by the Court of Chancery was superseded by the predecessor statute to Section 271, if it ever existed in Delaware at all.[123]

Daniel's reliance on *Stream TV* fails because the Irrevocable Proxy is not plain and unambiguous that it runs with the Majority Shares. The Court of Chancery did not ignore the plain language of the Irrevocable Proxy in favor of the common law rules in the Restatement (Third). Rather, it found that "[i]n the abstract and read in isolation, the phrase 'any act of the Stockholder' is susceptible to two meanings" and it looked to the

---

[122] *Id.* at 334 (quoting *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 250 A.3d 1016, 1045 (Del. Ch. 2020)).

[123] *Id.* at 343.

Restatement (Third) to determine the more "persuasive" reading.[124] This is evident by the court's stating that Daniel's reading of that provision was only "one possible reading," as well as by the various other provisions, including the Addendum, which it found created ambiguity. The Court of Chancery's analysis could have stopped there because under Delaware law, ambiguity in an irrevocable proxy is construed against the rights of the proxy holder.[125] If an irrevocable proxy does not unambiguously provide that it will run with the shares in a sale to a subsequent owner, then it does not do so. As the Court of Chancery concluded, "the presence of ambiguity alone is sufficient to defeat Daniel's argument."[126]

*ii. The Date of Publication of the Restatement (Third) is Not Dispositive*

*Second*, Daniel places much weight on the fact that the Restatement (Third) was not published until 2006, nine years after the parties drafted and executed the Irrevocable Proxy. He argues that as a result, the parties could not possibly have drafted the Irrevocable

---

[124] *Chancery Opinion*, 273 A.3d at 821 ("Read against the backdrop of the default common law rules concerning scenarios when irrevocable proxies terminate, given the presence of the Addendum, and without any explicit reference in the Non-Termination Provision to a sale of the Majority Shares, only Mrs. Hawkins' reading is persuasive."); *see also Concord Real Estate CDO 2006-1, Ltd. v. Bank of America N.A.*, 996 A.2d 324, 332 (Del. Ch. 2010) ("I look to the common law because this body of jurisprudence provides a backdrop of standard default rules that supplement negotiated agreements and fill gaps when a contract is incomplete, whether by inadvertence or design."), *aff'd*, WL 743405 (Del. 2011) (TABLE).

[125] In other words, it did not need to "confirm" what the "more natural reading" was. *See Chancery Opinion*, 273 A.3d at 819 ("Read in context and against the backdrop of the common law, the more natural reading is that the Non-Termination Provision confirms that the Stockholder cannot terminate the Irrevocable Proxy while owning the Majority Shares.").

[126] *Id.* at 821.

Proxy with the default principles articulated in the Restatement (Third).[127] This argument is unpersuasive for the same reason stated above.

Because the Restatement (Third) is an articulation of existing common law,[128] the relevant question is whether at the time the Irrevocable Proxy was executed, Delaware common law supported the principle cited in the Restatement (Third). Daniel did not cite Delaware case law that establishes his view of the common law in Delaware in 1997 when the Irrevocable Proxy was executed. However, we observe that the Court of Chancery recognized a principle similar to that stated in comment b several times prior to 1997. In 1941, the court recognized that "[t]he right to vote shares of corporate stock, having voting powers, has always been incident to its legal ownership.[129] And in 1993, it stated that Delaware law presumes that "in the sale of the underlying stock . . . the seller is contracting to sell and assigns all of its rights, title and interest in the stock."[130] Similarly, in 1875, the

---

[127] Opening Br. at 24.

[128] *See, e.g.*, *Samson v. Smith*, 560 A.2d 1024, 1027–28 (Del. 1989) (observing that the Restatement (Second) of Torts is "merely a formulation of well established common law principles").

[129] *In re Giant Portland Cement Co.*, 21 A.2d 697, 701 (Del. Ch. 1941); *see also Giuricich v. Emtrol Corp.*, 449 A.2d 232, 239 (Del. 1982) ("As a general rule the right to vote shares of corporate stock having voting powers at stockholders' meetings is an incident of their legal and record ownership.") (citing *Tracy v. Brentwood Village Corp.*, 59 A.2d 708, 709 (Del. Ch. 1948))); *Norton v. Digital Applications, Inc.*, 305 A.2d 656, 659 (Del. Ch. 1973) ("The right to vote shares of stock issued by a Delaware corporation is an incident of legal ownership.").

[130] *Commonwealth Assocs.*, 641 A.2d at 158. In considering the validity and enforceability of a negotiated provision providing for the retention of a "dangling" right to vote as of the record date in a post-record date sale of corporate stock, Chancellor Allen stated that "the legally presumed implication, in a sale of the underlying stock, would be that the seller is contracting to sell and assign all of its rights, title and interest in the stock, including its right to grant a consent or a revocation with respect to a past record date, and that upon request the seller will, in good faith, take such ministerial steps as are necessary (e.g., granting proxies) to effectuate that transfer." *Id.*

United States Supreme Court recognized the principle that all rights and obligations follow shares in a transfer of stock.[131] These cases stand for the general proposition that, when legal ownership of stock is transferred, the right to vote such stock is transferred too. Although *Genger Trial* came later, we note that the principle of law articulated in *Genger Trial* requiring an irrevocable proxy to clearly and unambiguously state that it runs with shares in a transfer to a third party,[132] suggests that the default common law rule is that voting rights follow the shares in a stock transfer.

In any event, we need not resolve the debate about whether the rule provided in comment b of the Restatement (Third) — or some other rule as Daniel contends — was firmly established common law in Delaware at the time the Irrevocable Proxy was executed because the Court of Chancery's discussion of the Restatement (Third) was not essential to its finding that the Irrevocable Proxy does not clearly and unambiguously state that it shall run with the Majority Shares.[133] Daniel's arguments fail because at the most, his arguments show only that there are two reasonable ways to read the Non-Termination

---

[131] *Webster v. Upton*, 91 U.S. 65, 70 (1875) ("When an original subscriber to the stock of an incorporated company, who is so bound to pay the instalments on his subscription from time to time as they are called in by the company, transfers his stock to another person, such other person is substituted not only to the rights, but to the obligations, of the original subscriber, and he is bound to pay up the instalments called for after the transfer to him.") (citing JOSEPH K. ANGELL & SAMUEL AMES, *Treatise on the Law of Private Corporations* § 534 (4th ed. 1852))).

[132] *Genger Trial*, 2010 WL 2901704, at *20 ("Even if the language of the Proxy was ambiguous–which it is not–public policy concerns require that the Proxy be strictly construed.").

[133] For the same reasons, we need not address Daniel's third and final argument that the Restatement (Second) of Agency § 139 cmt. a (Am. Law Inst. 1958), which was the provision in effect when the Irrevocable Proxy was executed, conflicts with comment b, which he contends "represented a material change in the default principles." Opening Br. at 24–25; Reply Br. at 4.

Provision and, thus, the Irrevocable Proxy is ambiguous.[134] For the public policy reasons discussed above, a showing of ambiguity requires us to construe the Non-Termination Provision narrowly, as the Court of Chancery did below, against the rights of the proxy holder.

*b. The Court of Chancery Did Not Err in Concluding that the Language "Any Other Event or Events" Does Not Include a Sale of the Majority Shares*

The Non-Termination Provision states that the Stockholder agrees that the proxy will not terminate in the specific situations discussed above, "or by the occurrence of any other event or events other than as provided in Section 4 hereof."[135] Daniel argues that this language serves as a catch-all for acts of the Stockholder and encompasses a sale of the Majority Shares.[136] The Court of Chancery acknowledged the catch-all nature of this language but concluded that it was subject to "at least two interpretations."[137] Moreover, it concluded that "against the backdrop of the common law rules, in the presence of the Addendum, and in the absence of any reference to a transfer of the Majority Shares," only one reading was reasonable, namely, that the catch-all encompassed only those actions taken by the Stockholder while the Stockholder owns the Majority Shares.[138] On appeal, Daniel argues that the Court of Chancery improperly read the language "while the

---

[134] *See Cox Commc'ns, Inc. v. T-Mobile US, Inc.*, 273 A.3d 752, 760 (Del. 2022) ("Ambiguity is present 'only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings.'") (quoting *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992))).

[135] App. to Opening Br. at A035 (Irrevocable Proxy at 2, ¶ 5).

[136] Opening Br. at 28.

[137] *Chancery Opinion*, 273 A.3d at 822.

[138] *Id.*

Stockholder owns the shares" into the Non-Termination Provision and did not give effect to the plain meaning of the catch-all language, which would include a sale of the Majority Shares as "any other event or events."[139]

*First,* Daniel's contends that no Delaware authority requires the use of the word "transfer" or "sale" to manifest the parties' intent for a proxy to run with the shares.[140] However, the Court of Chancery did not hold that, for an irrevocable proxy to run with shares, the proxy instrument must use the magic words "transfer" or "sale." Rather, the Court of Chancery held that for an irrevocable proxy to run with shares, the proxy instrument must evince the parties' clear and unambiguous intent for it to do so. In this case, the absence of the words "transfer" or "sale" supports the Court of Chancery's finding that the Irrevocable Proxy did not evince such an intent, particularly in the face of how the word "transfer" is used elsewhere in the Irrevocable Proxy, the presence of the Addendum, and its unchallenged findings as to the Appointment Provision and the definitions of "Stockholder" and "Shares."

The Court of Chancery also relied on its opinion in *Genger Trial*,[141] which we affirmed in relevant part.[142] There, the Court of Chancery found that the absence of language regarding transferees in the assignment provision indicated the parties did not intend for the proxy to follow the shares. The Court of Chancery stated:

---

[139] Opening Br. at 28.

[140] *Id.* at 29; Reply Br. at 9.

[141] 2010 WL 2901704.

[142] *Genger*, 26 A.3d at 198 ("The Proxy contains no provision that would bind any *subsequent* owner of those shares.") (emphasis in original).

> If [the proxyholder] wanted to keep the Proxy after a transfer, he could have easily inserted clear language–such as "this Proxy shall bind any subsequent transferees"–into the Proxy to that effect. He did not, and thus there is no reason found in the text of the Proxy to indicate that it is binding upon the [subsequent transferee].[143]

Daniel does not attempt to distinguish *Genger Trial* in his briefing on appeal, and the same reasoning applies here.

Further, Daniel reads the Non-Termination Provision in a vacuum, apart from its context. Mrs. Hawkins more persuasively considers the Non-Termination Provision in the context of the structure of the entire Irrevocable Proxy. The Non-Termination Provision begins by saying that "[t]he Stockholder agrees," meaning Pike. The recitals and Appointment Provision indicate that the Irrevocable Proxy applies only to shares held by the Stockholder. Absent the explicit language of a "transfer" or "sale," a reasonable reading of the language "any other event" is that, consistent with the rest of the Non-Termination Provision and the Irrevocable Proxy, it only applies to events occurring when the Stockholder (Pike and now the Partnership) owns the shares. Daniel's response that "an Irrevocable Proxy always represents a commitment of the stockholder at the time of execution since such person is the only one that has the power to grant the authority to the proxy holders to vote the shares"[144] is unavailing because the definition of "Stockholder" only references Pike, and as explained by the Addendum, Old MedApproach or any other MedApproach Person who holds any of the Shares or any of the Proxy Shares and agrees

---

[143] *Genger Trial*, 2010 WL 2901704, at *20.

[144] Reply Br. at 6.

to be bound by the Irrevocable Proxy. Again, the Court of Chancery's unchallenged findings as to the significance of the definitions of "Shares" and "Stockholder," or the Appointment Provision, support an alternative reasonable reading of the Irrevocable Proxy, and at the very least, render the contract ambiguous.

We find Daniel's counterargument that the "provision elsewhere makes clear that circumstances in which the Stockholder no longer owns the shares (*e.g.*, the death of the Stockholder) will not affect a termination" more persuasive.[145] Still, it only rises to the level of one possible interpretation of the Non-Termination Provision. It does not overcome the Court of Chancery's unchallenged findings and unambiguously provide that the Irrevocable Proxy shall run with the Majority Shares.

*Finally,* Daniel claims that the Court of Chancery erred as a matter of law by relying on the existence of the Addendum because the Addendum was a separate agreement apart from the Irrevocable Proxy and it "was drafted by Popco and its counsel, not the giver of the Irrevocable Proxy."[146] He further argues that even if we were to consider the existence of the Addendum, the Addendum was only "belt and suspenders" and did not reflect an intent for the Irrevocable Proxy to run with the shares.

To begin with, the Addendum is best viewed as part of the Irrevocable Proxy and not as extrinsic evidence, as Daniel claims.[147] The Addendum is on "the face of the

---

[145] Opening Br. at 29; Reply Br. at 8–9.

[146] Opening Br. at 30.

[147] *See Chancery Opinion*, 273 A.3d at 811 ("In broad strokes, the Irrevocable Proxy consists of a preamble with recitals, fifteen operative provisions, and the Addendum.").

contract"[148] and is within "its four corners."[149] It is found in a single paragraph on the signature page to the Irrevocable Proxy — the same signature page that Pike signed as the Stockholder.[150] It was also executed on the same day as the Irrevocable Proxy.

Moreover, other facts undercut Daniel's argument, including the Court of Chancery's factual finding that Popco saw a need for the Addendum because it did not believe the Irrevocable Proxy would otherwise run with the Majority Shares.[151] Based on the record, the trial court's findings are not clearly erroneous.

Finally, we find Daniel's "belt-and-suspenders" argument unpersuasive because of the lack of clear language in the proxy instrument that the Irrevocable Proxy will run with the shares and the presence of the Transfer Restriction. A "belt-and-suspenders" reading cuts against our preference to avoid redundancy in interpreting contracts.[152] The

---

[148] *See Evidence*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "extrinsic evidence" as "[e]vidence relating to a contract but not appearing on the face of the contract because it comes from other sources, such as statements between the parties or the circumstances surrounding the agreement").

[149] *See GMG Cap. Invs., LLC v. Athenian Venture P'rs. I, L.P.*, 36 A.3d 776, 783 (Del. 2012) (observing that, when applied, "the parol evidence rule bars the admission of evidence from outside the contract's four corners to vary or contradict [ ] unambiguous language").

[150] App. to Opening Br. at A039–40 (Irrevocable Proxy at 5–6).

[151] *Chancery Opinion*, 273 A.3d at 829 (citing W. B. Daniel Trial Testimony at 146–47).

[152] *Compare Osborn*, 991 A.2d at 1159 ("'We will read a contract as a whole and we will give each provision and term effect, so as not to render any part of the contract mere surplusage.' We will not read a contract to render a provision or term 'meaningless or illusory.'") (first citing *Kuhn Construction, Inc. v. Diamond State Port Corp.*, 2010 WL 779992, at *2 (Del. Mar. 8, 2010); then citing *Sonitrol Holding Co. v. Marceau Investissements*, 607 A.2d 1177, 1183 (Del. 1992))), *with Julius v. Accurus Aerospace Corp.*, 2019 WL 5681610, at *11 (Del. Ch. Oct. 31, 2019) ("While redundancy is sought to be avoided in interpreting contracts, this principle of construction does not go so far as to counsel the creation of contract meaning for which there is little or no support in order to avoid redundancy.") (citing *U.S. W., Inc. v. Time Warner Inc.*, 1996 WL 307445, at *15 (Del. Ch. June 6, 1996))), *aff'd*, 241 A.3d 220 (Del. 2020). *See also* ANTONIN SCALIA & BRYAN A. GARNER, *Reading Law: The Interpretation of Legal Texts* 176 (2012) ("If a provision is

Addendum does not solely serve to clarify that the Irrevocable Proxy is binding on Old MedApproach; it also contains the Transfer Restriction. The Court of Chancery found that the Transfer Restriction applies only to MedApproach Persons, as defined in the Addendum, but not to unaffiliated third parties. Daniel does not challenge this interpretation on appeal. Thus, the Addendum serves a further purpose, which itself demonstrates that the Irrevocable Proxy does not otherwise bind unaffiliated third parties.

*3. The Assignment Provision*

Daniel's third and final argument on appeal is that the Court of Chancery erred by not giving "effect to all of the terms of the Irrevocable Proxy and improperly limiting the assignment clause of the Irrevocable Proxy so as not to bind assigns of the Stockholder."[153] The Assignment Provision, found in paragraph 15 of the Irrevocable Proxy, states in its entirety:

> This Irrevocable Proxy and the rights of the Holders under this Irrevocable Proxy may not be assigned except that (a) any Holder may, with the consent of the remaining Holders, transfer such Holder's rights to any person who is, or is affiliated with, a limited partner of the Partnership, and (b) the Holders may act pursuant to this Irrevocable Proxy, in voting the Proxy Shares or otherwise, through any duly authorized officer or employee of [Danco GP]. This Irrevocable Proxy shall be binding upon and inure to the benefit of Stockholder and the Holders and their respective heirs, devises, legatees, personal representatives, agents and permitted assigns.[154]

---

susceptible of (1) a meaning that gives it an effect already achieved by another provision, or that deprives another provision of all independent effect, and (2) another meaning that leaves both provisions with some independent operation, the latter should be preferred.").

[153] Opening Br. at 3; Reply Br. at 14.

[154] App. to Opening Br. at A037 (Irrevocable Proxy at 4, ¶ 5).

The Assignment Provision begins with a blanket prohibition on assignment by the Holders in the first sentence (the "No-Assignment Clause"), followed by two exceptions to the blanket prohibition in clauses (a) and (b) (the "Holder Exceptions"). The final sentence identifies the beneficiaries of the Irrevocable Proxy and those who will be bound by the Irrevocable Proxy (the "Bound Parties Clause").

Daniel argues that the Bound Parties Clause causes the Irrevocable Proxy to bind the Stockholder and his permitted assigns, which includes purchasers of the Majority Shares. Rejecting this argument, the Court of Chancery first held that the phrase "permitted assigns" does not include purchasers of the Majority Shares. It then held that, even if Daniel is correct that the phrase "permitted assigns" included subsequent purchasers, the "only reasonable" reading of the Bound Parties Clause is that it binds only the "permitted assigns" of the Holders, not those of the Stockholder.[155] The Court of Chancery explained that this reading was the "only reasonable" one because it applies the rule of the last antecedent,[156] accords with the "more natural reading" of the sentence, and "better fits the

[155] *Chancery Opinion*, 273 A.3d at 825–26.

[156] The rule of the last antecedent is a canon of construction which provides that:

> Referential and qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent. The last antecedent is the last word, phrase, or clause that can be made an antecedent without impairing the meaning of the sentence. Thus a proviso usually applies to the provision or clause immediately preceding it. A qualifying phrase separated from antecedents by a comma is evidence that the qualifier is supposed to apply to all the antecedents instead of only to the immediately preceding one.

2A NORMAN J. SINGER & SHAMBIE SINGER, *Sutherland Statutes and Statutory Construction* § 47:33 (7th ed. 2010), *available at* Westlaw (database updated Nov. 2022) (internal quotation marks and footnotes omitted); *see also Rubick v. Sec. Instrument Corp.*, 766 A.2d 15, 18 (Del. 2000) (applying the rule that "[r]eferential and qualifying words and phrases, where no contrary

structure of the Assignment Provision, which starts with the No-Assignment Clause, continues with the Holder Exceptions, and finishes with the Bound Parties Clause and its specific reference to 'permitted assigns.'"[157]

*a. The Court of Chancery Did Not Err in Finding That "Permitted Assigns" Does Not Include Transferees*

As a Delaware court, we interpret "contract terms according to their plain, ordinary meaning."[158] Daniel argues that the Court of Chancery committed legal error in finding that the terms "assigns" and "transferees" "are not equivalent and the Irrevocable Proxy needed to use the specific word 'transferee,' not 'assign,' to bind subsequent owners."[159] He asserts that, although the Court of Chancery properly looked to the dictionary definition of "assignment," its interpretation of the Bound Parties Clause was "inconsistent with the plain dictionary definition of an assignment as encompassing the transfer of property from one person to another," a definition we recognized in *Stream TV*.[160]

We disagree. Although it is true, as we discussed in *Stream TV*, that an assignment may be a "type of transfer or relinquishment of property[;]"[161] context matters in

---

intention appears, refer solely to the last antecedent") (quoting 2A NORMAN J. SINGER, *Sutherland Statutes and Statutory Construction*, § 47.33 (6th ed. 2000))).

[157] *Chancery Opinion*, 273 A.3d at 825–26.

[158] *Alta Berkeley VI C.V.*, 41 A.3d at 385.

[159] Opening Br. at 34–35.

[160] *Id.* at 35 (referencing *Stream TV*, 279 A.3d at 340–41).

[161] *Stream TV*, 279 A.3d at 340. As discussed herein, the question before this Court in *Stream TV* was whether the "transfer and assignment of all rights, title and interest in all of [Stream TV Inc.'s] assets" for the benefit of creditors was "a sale, lease, or other disposition" such that it would require a majority Class B stockholder vote under Stream TV Inc.'s charter. *Id.* In interpreting the charter's plain language, we looked to dictionary definitions of "disposition" and "assignment," and read the charter as a whole, particularly looking to the definition of "[t]ransfer" and the usage

determining which "type" of transfer.[162] "[I]t is well established that a court interpreting any contractual provision . . . must give effect to all terms of the instrument, must read the instrument as a whole, and, if possible, reconcile all the provisions of the instrument."[163] In the context of the Irrevocable Proxy, Daniel's plain reading of the term is not nuanced enough, particularly given the structure of the Assignment Provision, and how the term "transferee" is used elsewhere in the Irrevocable Proxy. His reading overlooks the fundamental nature of a proxy as an instrument that divides the economic rights and the voting rights that attach to share ownership.

Comparing dictionary definitions of "transfer,"[164] to definitions of "assignee,"[165] the Court of Chancery found that an "assignee generally does not receive the full bundle of

---

of "disposition" therein. From this analysis, we found that "[a]n assignment of all rights, title and interest in the assets of the [c]ompany to [another] is a 'disposition' because it is a *type of* transfer or relinquishment of property." *Id.* (emphasis added). As the Court of Chancery found here, an assignment is a narrower term than transfer; it is a type of transfer. *Chancery Opinion*, 273 A.3d at 826 (explaining "[a] transfer is the broader term, and it generally refers to a change involving all aspects of ownership" whereas "[a]n assignment is the narrower term, and it generally refers to a change involving specific rights"). The Stream Omnibus Agreement provided for a broad type of transfer and assignment. By its language it "*transferr[ed] and* assign[ed] *all* rights, title and interest." *Stream TV*, 279 A.3d at 340 (emphasis added). Here, "assigns" is used in a narrower sense.

[162] *See Chicago Bridge & Iron Co. N.V. v. Westinghouse Electric Co. LLC*, 166 A.3d 912, 913–14 (Del. 2017) ("In giving sensible life to a real-world contract, courts must read the specific provisions of the contract in light of the entire contract."); *see also* SCALIA & GARNER, *supra* note 152, at 69 (observing that the ordinary-meaning canon, that "[w]ords are to be understood in their ordinary, everyday meanings—unless the context indicates that they bear a technical sense," "governs constitutions, statutes, rules, and private instruments").

[163] *See Alta Berkeley VI C.V.*, 41 A.3d at 385–86 (quoting *Elliot Assoc., L.P. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998)).

[164] *Chancery Opinion*, 273 A.3d at 826 (citing *Transfer*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("A conveyance of title or property from one person to another.").

[165] *Id.* (citing *Assignee*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("Someone to whom property rights or powers are transferred by another.") and RESTATEMENT (SECOND) OF CONTRACTS § 316

rights associated with the underlying property interest, but rather only a subset of those rights."[166] Additional dictionary definitions suggest that an "assignee" is the word commonly used for someone who receives a "right" underlying the property interest.[167]

Accordingly, the Court of Chancery found that the terms are used differently in different contexts.[168] The court observed that this difference "is perhaps best reflected in our alternative entity statutes, where an effort to transfer an interest in a limited partnership or limited liability company results in the recipient becoming an assignee who possesses economic rights, but not governance rights."[169] The same is true in contract law, where, as the court observed, "the original counterparty remains bound under the contract notwithstanding the assignment, unless the new party is substituted through a novation."[170]

Although we agree with the Court of Chancery that "transferee" and "assigns" are used differently in different contents, we recognize that the terms can have overlapping meanings.[171] Resolution here hinges on whether the terms were used differently in this

---

(Am. Law. Inst. 1981), *available at* Westlaw (database updated Oct. 2022) (defining "[a]ssignment" as "the transfer of a right by the owner (the oblige or assignor) to another person (the assignee)")).

[166] *Id.*

[167] *Assignee*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/assignee (last visited Dec. 21, 2022) ("[A] person to whom a right or property is transferred.").

[168] *See* SCALIA & GARNER, *supra* note 152, at 70 (observing that most common English words have more than one ordinary meaning and stating that "[o]ne should assume the contextually appropriate ordinary meaning unless there is reason to think otherwise").

[169] *Chancery Opinion*, 273 A.3d at 826–27 (citing 6 *Del. C.* § 17-702(a)).

[170] *Id.* at 827 (citing *Schwartz v. Centennial Ins. Co.*, 1980 WL 77940, at *2 (Del. Ch. Jan. 16, 1980) and *P.C. Connection, Inc. v. Synygy Ltd.*, 2021 WL 57016, at *14 (Del. Ch. Jan. 7, 2021)).

[171] *See Transferee*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/transferee (last visited Dec. 21, 2022) ("[A] person to whom something is transferred or conveyed.").

context.[172] The structure of the Assignment Provision along with the divergent uses of the terms elsewhere in the Irrevocable Proxy support the Court of Chancery's conclusion that they were used differently here, and that the term "permitted assigns" does not include transferees.

The word "assigns" in the Assignment Provision takes on a different meaning than the word "transferee" does in the Addendum. Their respective uses are consistent with the Court of Chancery's determination that, in the Irrevocable Proxy, an assignee is one who receives only a subset of property rights, whereas a transferee is one who receives all property rights associated with the underlying property interest. In the Assignment Provision, "permitted assigns" are those who have been assigned the "Irrevocable Proxy" or the "rights of the Holders." The Assignment Provision is structured as a prohibition on the assignment of "the rights of the Holders," followed by two exceptions. The first exception allows a Holder who has the consent of the other Holders to "transfer such Holder's *rights*" to "any person affiliated with a limited partner of the Partnership." The second exception allows a Holder "in voting the Proxy Shares or otherwise" to do so through a duly authorized officer or employee of Danco GP.

On the other hand, "transferee" is used in the Addendum to refer to someone who has been transferred legal ownership of the shares, rather than only the underlying voting

---

[172] *Lorillard Tobacco v. Am. Legacy Found.*, 903 A.2d 728, 740 (Del. 2006) ("There may be more than one dictionary definition, and parties may disagree on the meaning of the definition as applied to their case, but if merely applying a definition in the dictionary suffices to create ambiguity, no term would be unambiguous. A court must accept and apply the plain meaning of an unambiguous term in the context of the contract language and circumstances, insofar as the parties themselves would have agreed *ex ante*.") (internal quotation marks and footnotes omitted)).

rights. The Addendum documents Old MedApproach's agreement "not to transfer any such shares to any other MedApproach Person unless such transferee agrees in writing satisfactory to the [ ] Holders (other than W. Bradley Daniel) to be bound)."[173] The fact that the parties could have used "transferee" in the Assignment Provision, as they did elsewhere in the Irrevocable Proxy, but chose not to, supports the Court of Chancery's reading as a reasonable one.

The Court of Chancery also relied on its decision in *Genger Trial* with respect to transferee language, discussed above. Daniel argues that no Delaware court has held that the drafters of an irrevocable proxy need to use the magic word "transferee" for the irrevocable proxy to run with the shares and be binding on a subsequent owner.[174] But the Court of Chancery did not require the use of the word "transferee" for an irrevocable proxy to be binding. Rather, it found that the absence of the words "transferee," "transfer," or "sale," in the context of the plain language of the Irrevocable Proxy, indicated that the instrument was not intended to run with a transfer of the underlying shares. Here, the language of the Assignment Provision does not clearly provide that the Irrevocable Proxy will run with the shares. In sum, considering that the fundamental nature of an irrevocable proxy involves a division of property rights, the structure of the Assignment Provision, and the divergent uses of the terms in the Irrevocable Proxy, the Court of Chancery's finding that permitted assigns does not include transferees was not legal error.

---

[173] App. to Opening Br. at A039 (Irrevocable Proxy at 5).

[174] Opening Br. at 35–36.

*b. Nor does the Bound Parties Clause Provide that the Irrevocable Proxy Runs with the Majority Shares*

Even if Daniel is right that the term "assigns" includes "transferees" in this case, his reliance on the Assignment Provision fails because the term "permitted assigns" does not clearly apply to those of the Stockholder. The Court of Chancery found that the plain language of the sentence was ambiguous as to whether it bound permitted assigns of the Stockholder in addition to those of the Holders. It then looked to the structure of the provision and applied the rule of the last antecedent and grammatical canons to conclude that the Bound Parties Clause only binds permitted assigns of the Holders, not those of the Stockholder.

The rule of the last antecedent is a settled principle of interpretation.[175] It provides that "referential and qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent."[176] Read according to the rule, the adjective "their" in the Bound Parties Clause modifies the only the nearest antecedent: "the Holders." Therefore, only the permitted assigns of the Holders are bound, not the permitted assigns of the Stockholder.

On appeal, Daniel argues that reliance on the rule of the last antecedent was legal error because application of the rule here, "violate[s] [the] cardinal principle" that courts

[175] *See, e.g.*, *Rag Am. Coal Co. v. AEI Res., Inc.*, 1999 WL 1261376, at *4 (Del. Ch. Dec. 7, 1999) (observing that ordinarily, qualifying words or phrases, where no contrary intention appears, usually relate to the last antecedent) (internal quotation marks omitted).

[176] *Rubick*, 766 A.2d at 18 (quoting SINGER, *supra* note 156).

are "to give effect to all terms of the instrument."[177] According to Daniel, the Stockholder is already bound by the Irrevocable Proxy so if the adjective "their" does not reach back through "Holders" to modify "Stockholder" then the word "Stockholder" serves no purpose in the sentence. It becomes surplusage.

The Court of Chancery acknowledged that Daniel's reading is reasonable, but it concluded that the Bound Parties Clause is ambiguous. It noted that the placement of an adjective often creates ambiguity.[178] Here, the ambiguity is compounded by the omission of an Oxford comma.[179] The Court of Chancery reconstructed the Bound Parties Clause, this time eliminating an "and" and placing an Oxford comma:

> If "their" applied to both "Stockholder" and "the Holders," then the natural way to write the sentence would be to say that "[t]his Irrevocable Proxy shall be binding upon and inure to the benefit of Stockholder, the Holders, and their respective heirs, devises, legatees, personal representatives, agents and permitted assigns."[180]

If the drafters of the Irrevocable Proxy had written the Bound Parties Clause as laid out above, Daniel's reading would be the most natural one. But they did not do so. Daniel argues that "[a] court applying Delaware law will not allow the imprecise placement of

---

[177] Opening Br. at 33–34 (citing *Elliot Assocs.*, 715 A.2d at 854).

[178] *Chancery Opinion*, 273 A.3d at 825.

[179] An Oxford comma (aka a serial comma or Harvard comma) is a comma that separates the last from the next-to-last item in a list of more than two. It normally follows a conjunction. *See* BRYAN A. GARNER, *Garner's Modern English Usage* 897, 981 (5th ed. 2022)).

[180] *Chancery Opinion*, 273 A.3d at 825–26. *Accord* GARNER, *supra* note 179, at 982, 985. Garner explains that proponents of the Oxford comma "point out that including it *never* creates an ambiguity, whereas omitting it fairly often does." GARNER, *supra* note 179, at 982. In line with the weight of authority, Garner himself favors a bright line rule of including an Oxford comma to ensure consistency and clarity. GARNER, *supra* note 179, at 985.

adverbs and commas to alter the otherwise plain meaning of a contractual provision or to frustrate the overall plan or scheme memorialized in the parties' contract."[181] But the Court of Chancery's reasoning for applying the rule of the last antecedent and other grammatical canons was precisely because the provision was ambiguous.[182]

Mrs. Hawkins interpretation also fits better with the grammatical rule of pronoun-antecedent agreement. The plural possessive "their" agrees with the plural antecedent "the Holders," not the singular antecedent "Stockholder."[183] Moreover, it brings the Bound Parties Clause into compliance with the grammatical rules governing determiners.[184]

---

[181] Reply Br. at 15 (citing *Symbiont.iO, Inc. v. Ipreo Hldgs., LLC*, 2021 WL 3575709, at *35 (Del Ch. Aug. 13, 2021) (internal quotation marks omitted)). *Accord E.I. du Pont de Nemours & Co. v. Green*, 411 A.2d 953, 956 (Del. 1980) ("[T]he [last antecedent] rule has its limitations, as stated in 2A Sutherland, Statutes and Statutory Constructions, § 47.33 (4th [e]d. 1973), 'When the sense of the *entire act* requires that a qualifying word or phrase apply to several preceding or succeeding sections, the word or phrase will not be restricted to its immediate antecedent.'") (emphasis added)); *MicroStrategy Inc. v. Acacia Research Corp.*, 2010 WL 5550455, at *7 (Del. Ch. Dec. 30, 2010) ("In reaching that conclusion, I am mindful that grammar and punctuation are of secondary importance to a court in interpreting a contract where such grammar and punctuation reasonably would frustrate the parties' clear intent as evinced from the language used in the contract. Indeed, a court should 'not allow the imprecise placement of adverbs and commas to alter the otherwise plain meaning of a contractual provision or to frustrate the overall plan or scheme memorialized in the parties' contract.'") (citing *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 555–56 (Del. Super. 2005), *aff'd*, 886 A.2d 1278 (Del. 2005))); *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1170 n.5 (2021) ("Linguistic canons are tools of statutory interpretation whose usefulness depends on the particular statutory text and context at issue."); *see also Barnhart v. Thomas*, 540 U.S. 20, 26 (2003) (observing that the rule is "not absolute" and can be "overcome by other indicia of meaning").

[182] *Chancery Opinion*, 273 A.3d at 825, 828; *see also Stream TV*, 279 A.3d at 341, 341 n.99 (collecting cases standing for the proposition that if a contractual provision is unambiguous, the court need not interpret it and the language of the provision itself controls).

[183] *See* GARNER, *supra* note 179, at 239 ("[A] relative pronoun is supposed to agree with its antecedent in both number and person."). *But cf.* GARNER, *supra* note 179, at 239 (recognizing that the matching of "they" with a singular noun is now a common way to avoid sexist or gendered language).

[184] A determiner is "[a] type of adjective that limits how a noun element applies." GARNER, *supra* note 179, at 1204. Examples of determiners "are articles (*a*, *an*, and *the*), demonstrative adjectives

Those rules state that "[w]ith postpositive modifiers, the insertion of a determiner before the second item tends to cut off the modifying phrase so that its backward reach is limited."[185] Here, the second item is "Holders" and the determiner is "the," which cuts off the modifying phrase "their" from reaching back to modify "Stockholder."

Finally, Daniel's reading is inconsistent with the structure of the Assignment Provision. As discussed above, the Assignment Provision is a prohibition on the rights of the Holders. It provides for two exceptions. Both only apply to the Holders because only the Holders are prohibited from assigning their rights. In a provision addressing a prohibition on the Holders' ability to assign their rights, the most natural reading is that "permitted assigns" refers to those assigns permitted by the Holders under the exceptions provided for in the previous sentence.

## *IV. CONCLUSION*

For the foregoing reasons, we hold that the Irrevocable Proxy does not run with the Majority Shares. Delaware law requires that the irrevocable proxy instrument clearly and unambiguously state that such proxy will continue with the shares upon their sale or transfer. The Irrevocable Proxy does not do so. Accordingly, we **AFFIRM** the judgment of the Court of Chancery.

---

(*this*, *that*, *these*, and *those*), and indefinite adjectives (e.g., *all*, *any*, *each*, *every*, *some*, *few*)." GARNER, *supra* note 179, at 1204.

[185] SCALIA & GARNER, *supra* note 152, at 149 (acknowledging that the effect of a determiner in these instances is "not entirely clear" and that a competent drafter will position it earlier in the phrase).